Terri Lee HALDERMAN, a retarded citizen, by her mother and guardian, Winifred Halderman, et al., Plaintiffs,

Pennsylvania Association for Retarded Citizens et al., on behalf of themselves and all others similarly situated, Plaintiffs-Intervenors,

United States of America,
Plaintiff-Intervenor,

v.

PENNHURST STATE SCHOOL & HOSPITAL et al., Defendants.

Civ. A. No. 74–1345.

United States District Court,
E. D. Pennsylvania.

Dec. 23, 1977.

On Injunctive Relief March 17, 1978.

David Ferleger, Philadelphia, Pa., for plaintiffs.

The Public Interest Law Center of Philadelphia, by Thomas K. Gilhool, Chief Counsel, Frank J. Laski and Edward A. Stutman, Philadelphia, Pa., for plaintiff-intervenors, Pennsylvania Assn. for Retarded Citizens and Jo Suzanne Moskowitz, Robert Hight, David Preusch, and Charles Di-Nolfi.

Peter A. Glascott, James M. McNamara, Asst. City Sol., Doylestown, Pa., for County of Bucks, George Metzer, Roger Bowers, Joseph Catania and Peter Bodenheimer.

David W. Marston, U. S. Atty., Washington, D. C., J. Stanley Pottinger, Asst. Atty. Gen., Civ. Rights Div., U. S. Dept. of Justice, Arthur E. Peabody, Jr., Louis M. Thrasher, Karin Christensen, Jose de Jesus Rivera, Attys., U. S. Dept. of Justice, Washington, D. C., for U. S.

Frank, Margolis, Edelstein & Scherlis, Joseph Goldberg, Philadelphia, Pa., for Margaret Green, Betty Uphold, Alice Barton, P. E. Klick, Dr. Parocca and Helen Francis.

Thomas M. Kittredge, Philadelphia, Pa., Patricia H. Jenkins, Media, Pa., for Faith Whittlesey, Char. Keeler, Wm. Spingle, Comm. of Delaware County, P. P. Burrichter--Delaware County.

Thomas F. Schilpp, Luchsinger, Schilpp, Murphy & Noel, Media, Pa., for Commissioners of County of Delaware and Paul Burrichter, Administrator.

Thomas M. Kittredge, Morgan, Lewis & Bockius, Philadelphia, Pa., for Robert Strebl, Earl Baker, Leo McDermott and William McKendry.

Paul Sacks, Asst. City Sol., Philadelphia, Pa., for Mayor Frank L. Rizzo, City Counsel of Philadelphia, and Leon Soffer.

Roger B. Reynolds, Montgomery County Sol., Ward A. Cotton, Sol., Montgomery, Joseph A. Smyth, Asst. Montgomery County Sol., Norristown, Pa., for A. Russell Parkhouse, Frank W. Jenkins, Lawrence H. Curry, Montgomery County Comm., and Hermann A. Roether.

Norman Watkins, Jeffrey Cooper, Deputy Attys. Gen., Dept. of Justice, Harrisburg, Pa., for Pennhurst State School & Hospital, Dept. of Public Welfare, Frank S. Beal, Stanley Meyers, Aldo Colautti, Wilbur Hobbs, Russell Rice, Jr., and C. Duane Youngberg.

## INDEX

Page

I. Procedural History .............. 1300
II. Parties ....................... 1300
III. Education, Training and Care (Habilitation) Afforded the Retarded at Pennhurst ................... 1302
   A. Staffing .................... 1303
   B. Habilitation at Pennhurst ...... 1304
   C. Restraints at Pennhurst ........ 1306
   D. Deterioration and Abuse of the Residents at Pennhurst ........ 1308
   E. Voluntariness ................ 1310
   F. Community Services in the Five County Area ................. 1311
   G. County Participation .......... 1312
IV. The Merits ..................... 1313
   A. Constitutional Right to Minimally Adequate Habilitation ......... 1314
   B. Constitutional Right to be Free from Harm .................. 1320
   C. Constitutional Right to Non-Discriminatory Habilitation ...... 1321
   D. Pennsylvania Statutory Right to Minimally Adequate Habilitation .. 1322
   E. Federal Statutory Right to Non-Discriminatory Habilitation ..... 1323
V. Liability of the Individual Defendants ........................ 1324
VI. Conclusion...................... 1325

## OPINION

RAYMOND J. BRODERICK, District Judge.

This is a class action in which the named plaintiffs are either residents or former residents of Pennhurst State School and Hospital, now known as Pennhurst Center ("Pennhurst"), an institution owned and operated by the Commonwealth of Pennsylvania, located in Spring City, Pennsylvania. These plaintiffs are all retarded persons, or their representatives, who claim injury based on violations of certain state[1] and federal[2] statutes as well as violations of certain constitutional rights[3] in connection with their institutionalization at Pennhurst. The plaintiffs seek both damages and broad equitable relief including the closing of Pennhurst, and mandating that the defendants provide them with education, training and care in their respective communities. "Habilitation" is the term of art used to refer to that education, training and care required by retarded individuals to reach their maximum development.

This matter was tried before the Court, sitting without a jury, over a period of thirty-two days, testimony being limited solely to the issue of liability. In connection therewith, the Court makes the following findings of fact and conclusions of law:

Mental retardation, by definition, is an impairment in learning capacity and adaptive behavior.[4] (Roos, N.T. 1–86). Retardation is wholly distinct from mental illness. Retarded individuals, just as other members of society, may suffer from mental illness. Mental retardation is primarily an educational problem and not a disease which can be cured through drugs or treatment. However, with proper habilitation, the level of functioning of every retarded person may be improved. (Glenn, N.T. 5–186).[5]

The incidence of mental retardation is about 3% in the general population. There are four basic levels of mental retardation: (1) mild (I.Q. 52–69) which comprises 89% of the mentally retarded population; (2) moderate (I.Q. 36–51) which comprises 6% of the

1. 50 P.S. §§ 4101 et seq., 4507, 4509.

2. 29 U.S.C. § 794; 42 U.S.C. §§ 1983, 1986, 6010.

3. First, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

4. Intelligence is generally measured through intelligence quotient tests (I.Q.), while ability to deal with social environment is measured through social quotient tests.

5. An individual may be functioning at a retarded level due to lack of education and/or training, and once supplied with that education and/or training, may be removed from the ranks of the retarded.

mentally retarded population; (3) severe (I.Q. 20–35) which in conjunction with (4) profound (I.Q. less than 20) comprises 5% of the mentally retarded population. (Roos, N.T. 1–89, 1–90).

Pennhurst, as an institution for the retarded, was on trial. Recent years have witnessed an assault upon such institutions.[6] At issue is whether the residents at Pennhurst have been the victims of violations of their statutory or constitutional rights; specifically whether Pennhurst as an institution has been violating the statutory or constitutional rights of its retarded residents in failing to provide them with minimally adequate education, training and care.

History is replete with misunderstanding and mistreatment of the retarded. As Wolf Wolfensberger points out in *The Origin and Nature of Our Institutional Models* 3 (1975):

It is chastening to recall that the retarded in American history were long grouped with other types of deviant groups. In early America, the Puritans looked with suspicion on any deviation from behavioral norms, and irregular conduct was often explained in terms of the supernatural, such as witchcraft. There is reason to believe that retarded individuals were hanged and burned on this suspicion. Later in New England, records show that lunatics, "distracted" persons, people who were *non compos mentis,* and those who had "fits" were all classed together, perhaps with vagabonds and paupers thrown in . . .. Connecticut's first house of correction in 1722 was for rogues, vagabonds, the idle, beggars, fortune tellers, diviners, musicians, runaways, drunkards, prostitutes, pilferers, brawlers—and the mentally afflicted . . .. As late as about 1820, the retarded, together with other dependent deviant groups such as aged paupers, the sick poor, or the mentally distracted were publicly "sold" ("bid off") to the *lowest* bidder, i. e., bound over to the person who

offered to take responsibility for them for the lowest amount of public support . . ..

The 10th (1880) U.S. census first combined "defectives," "dependents," and "delinquents" for reporting purposes. The Public Health Service combined "criminals, defectives, and delinquents" as late as the 1920's.

The National Conference on Charities and Correction, between about 1875 and 1920, often grouped the idiotic, imbecilic and feeble-minded with the deaf, dumb, blind, epileptic, insane, delinquent and offenders into one general class of "defectives." Few of us today are aware of the fact that the more contemporary term "mental defective" was coined to distinguish the retarded from these other "defectives," and it is no coincidence that many state institutions were for both the retarded and the epileptic. During the "indictment period," discussed later, an incredible range of deviances were associated with retardation; indeed, they were seen to be caused by it: illness, physical impediments; poverty; vagrancy; unemployment; alcoholism; sex offenses of various types, including prostitution and illegitimacy; crime; mental illness; and epilepsy. All these were called the "degeneracies."

Institutions for a number of "deviant" groups were founded in the United States in the mid-nineteenth century for the purpose of making the deviant less deviant. They were originally relatively small centers, often located within the community, in which intensive training could be concentrated on the deviants. Their emphasis was on education; they were viewed as temporary boarding schools, geared toward returning the individuals to their family or living group once appropriate skills were learned. By the late nineteenth century, however, these schools were replaced by asylums isolated from the community, where instead of providing the individual

---

**6.** *See, e. g.,* Mason & Menolascino, *The Right to Treatment for Mentally Retarded Citizens: An Evolving Legal and Scientific Interface,* 10 Creighton L.Rev. 124 (1976) [hereinafter cited as Mason & Menolascino].

with the education and training necessary to return to the community, they provided the protection and care it was thought that these individuals required. The asylum grew to be viewed as a permanent residential facility for the deviant. In the more progressive states, the retarded received their own facilities separated from other "deviant" groups. With this concept came increased isolation and increased size permitting little time for habilitation. *See generally,* W. Wolfensberger, *supra* at 24–56. Pennhurst was the product of this era.[7]

## I. *Procedural History*

This action was commenced in May, 1974. On November 26, 1976, it was certified by the Court as a class action, with the plaintiff class of retarded persons defined as:

All persons who as of May 30, 1974, and at any time subsequent, have been or may become residents of Pennhurst State School and Hospital. The members of the class are persons resident at Pennhurst State School and Hospital, persons residing in Bucks, Chester, Delaware, Montgomery and Philadelphia Counties who are on a waiting list for placement at Pennhurst State School and Hospital, and persons residing in Bucks, Chester, Delaware, Montgomery and Philadelphia Counties, who, because of the unavailability of alternate services in the community, may be placed at the Pennhurst State School and Hospital.

On February 4, 1977, by agreement of the parties, we entered an Order trifurcating the trial. This Order reads, in pertinent, part, as follows:

Said trial will be bifurcated—the first phase limited solely to the issue of liability. At such time as the Court issues its findings of fact and conclusions of law thereafter, a date shall be set for the second phase of the trial—to determine what relief, if any, a federal court can and should grant in this situation. At the conclusion of the second phase of the trial, a date shall be set for the third phase of the trial, if one is deemed necessary,—to determine damages due Plaintiffs.

The first phase of this non-jury trial began on April 18, 1977 and ended on June 13, 1977, occupying thirty-two court days.

## II. *The Parties*

The original complaint in this action was filed as a class action by Terri Lee Halderman, a retarded individual who had been admitted to Pennhurst on the application of her parents pursuant to 50 P.S. § 4402[8] in

---

7. From 1860 to 1960 there had been a marked increase in the number of mentally retarded individuals residing in our nation's institutions. Since 1966, this number has been decreasing. In 1966, 99 out of every 100,000 mentally retarded individuals were institutionalized. By 1976, that number had dropped to 71 out of every 100,000. In 1976, 154,000 mentally retarded individuals were residing in state public institutions, 32,000 were in hospitals for the mentally ill and 32,000 were in private institutions of various kinds. (Roos, N.T. 1–92, 1–93).

8. 50 P.S. § 4402 provides:

(a) Application for voluntary admission to a facility for examination, treatment and care may be made by:

(1) Any person over eighteen years of age.

(2) A parent, guardian or individual standing in loco parentis to the person to be admitted, if such person is eighteen years of age or younger.

(b) When an application is made, the director of the facility shall cause an examination to be made. If it is determined that the person named in the application is in need of care or observation, he may be admitted.

(c) Except where application for admission has been made under the provisions of section 402(a)(2) and the person admitted is still eighteen years of age or younger, any person voluntarily admitted shall be free to withdraw at any time. Where application has been made under the provisions of section 402(a)(2), only the applicant or his successor shall be free to withdraw the admitted person so long as the admitted person is eighteen years of age or younger.

(d) Each admission under the provisions of this section shall be reviewed at least annually by a committee, appointed by the director from the professional staff of the facility wherein the person is admitted, to determine whether continued care is necessary. Said committee shall make written recommendations to the director which shall be filed at the facility and be open to inspection and review by the department and such other persons as the secretary by regulation may permit.

1966. On July 29, 1974, the first amended complaint was filed, adding as name plaintiffs seven other retarded individuals [9] who had been admitted to Pennhurst upon the application of their parents. The amended complaint also added as a plaintiff the Parents and Family Association of Pennhurst representing 200 parents of retarded residents at Pennhurst. The Association was organized in 1967 to protect the rights of retarded citizens at Pennhurst and other institutions. (First amended complaint at 4).

On January 17, 1975, the Court granted the United States of America leave to intervene as a party plaintiff.[10] On November 12, 1975, the Court, without opposition, granted leave to intervene to the Pennsylvania Association for Retarded Citizens ("PARC") and four retarded individuals,[11] three of whom were court committed to Pennhurst pursuant to 50 P.S. § 4406 [12] or an earlier statute. PARC is a non-profit corporation which was founded in 1950 (Schmidt, N.T. 14–108) and has member chapters in fifty-seven of Pennsylvania's sixty-seven counties; its purpose being to advance the interest of retarded persons in Pennsylvania. The members of PARC include parents, other relatives, guardians, and next friends of persons residing at Pennhurst, and those in jeopardy of residing there.

Defendants are: Pennhurst; the Pennsylvania Department of Public Welfare;

Where the admission is under the provisions of section 402(a)(2), the person admitted shall be informed at least each sixty days of the voluntary nature of his status at the facility.

9. Larry Taylor, Kenny Taylor, Robert Sobetsky, Theresa Sobetsky, Nancy Beth Bowman, Linda Taub, and George Sorotos.

10. On November 29, 1976, we denied defendants' motion to dismiss the United States for lack of standing. Defendants' attempt to mandamus this Court to dismiss the United States failed. *Beal v. Broderick* (3d Cir. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

11. Jo Suzanne Moskowitz, Robert Hight, David Preusch, and Charles DiNolfi.

12. 50 P.S. § 4406 provides:

(a) Whenever a person is believed to be mentally disabled, and in need of care or treatment by reason of such mental disability, and examination of such person has been made by a physician or physicians, or for any reason the examination of such person cannot be made, a petition may be presented to the court of common pleas of the county in which a person resides or is, for his immediate examination or commitment to an appropriate facility for examination, observation and diagnosis.

(1) The petition may be made by a relative, guardian, friend, individual standing in loco parentis or by the executive officer or an authorized agent of a governmental or recognized nonprofit health and welfare organization or agency or any responsible person.

(2) The petition shall set forth the facts upon which the petitioner bases his belief of mental disability and the efforts made to secure examination of the person by a physician.

(3) Said court upon consideration of such petition shall: (i) issue a warrant requiring that such person be brought before said court; (ii) fix a date for a hearing which shall be as soon as the warrant is executed, and (iii) notify the parties in interest.

(4) After hearing, said court may: (i) order an immediate examination by two physicians appointed by said court, or (ii) order the commitment of the person believed to be mentally disabled, to a facility for a period not exceeding ten days for the purpose of examination. If the examination can be accomplished by partial hospitalization said court may so direct.

(b) If, upon examination, it is determined that such person is in need of care at a facility, the examining physicians or director, as the case may be, shall immediately report to said court which may order the commitment of such person for care and treatment.

In its order of commitment, said court may permit partial hospitalization or outpatient care, or if at any time thereafter the director shall determine such partial hospitalization or outpatient care to be beneficial to the person so committed, the same may be permitted by said court upon application by the director.

The court in *Goldy v. Beal,* 429 F.Supp. 640 (M.D.Pa.1976) (three-judge court) found this statute unconstitutionally vague with respect to the commitment of mentally ill persons. Pennsylvania's procedure for the involuntary commitment of mentally ill persons is now found in 50 P.S. §§ 7301–7306. The constitutionality of § 4406 as it applies to the retarded is not challenged in this litigation.

various state and county [13] officials responsible for supervising the Commonwealth's and the counties' retardation programs; and the superintendent and various employees of Pennhurst.

### III. Education, Training and Care (Habilitation) Afforded the Retarded at Pennhurst

Pennhurst, a residential institution for the retarded, was founded in 1908. It is owned and operated by the Commonwealth of Pennsylvania, and is located in Spring City, Pennsylvania about 30 miles from Philadelphia. Since its founding in 1908, the institution has been overcrowded and understaffed. (PARC Exhibit 40, R. Smilovitz, Pennhurst in Perspective: Purpose, Programs, Possibilities.) The present resident population is approximately 1,230, reduced from a high of nearly 4,000 in the early 1960's. (Youngberg, N.T. 22–123). Its staff numbers approximately 1,500. All parties concede that the institution has undergone tremendous improvement since the 1950's when, at best, the residents' treatment could be described as "warehousing". Even with these improvements, it was admitted by the defendants that Pennhurst does not presently meet minimum standards for the habilitation of its residents. (Rice, N.T. 26–24; Youngberg, Deposition at 22–31).[14]

Approximately half of the residents at Pennhurst have been admitted upon application of their parents or guardians, while the other half have been committed by a court. (Youngberg, N.T. 22–122). No distinction is made in the services extended to either group. The average [15] resident age at Pennhurst is 36, and the average stay at the institution is 21 years. Forty-three percent of the residents have had no family contact within the last three years.[16] Seventy-four percent of the residents are severely to profoundly retarded.[17] The average resident has had one psychological evaluation every three years and one vocational adjustment service report every 10 years. Those residents who have had more than one Vineland examination (measuring social quotient) during their residency at the institution, have, on the basis of this test, shown a decline rather than an increase in social skills while at Pennhurst (they declined an average of 7.542 points during their residence at Pennhurst, a loss of .596 points per year.) [18]

13. Representing Bucks, Chester, Delaware, Montgomery and Philadelphia Counties.

14. Pennhurst must satisfy both federal and state licensing standards to qualify for federal medical assistance (Title XIX funds), standards which Dr. Youngberg and Dr. Rice equated with minimally acceptable professional standards. (Rice, N.T. 27–57; Youngberg, Deposition at 27). Both the individual and the area in which he or she resides must be certified in order for the institution to qualify for funds. At Pennhurst only 16 out of the 40 living areas have been certified, though a majority of these areas have deficiencies. The deficiencies have either been waived, or Pennhurst has filed plans for correcting the deficiencies. (Pool, N.T. 18–27, 28–28). Five hundred fourteen residents live on these 16 wards and are eligible for funding. Another 600 Pennhurst residents would be eligible were they to reside on a certified ward. (Id., N.T. 17–209). To meet medical assistance living standards, the population of Pennhurst must be reduced to 850 residents. In addition, $1,028,327 is being expended to correct Life Safety Code violations—the completion date of this project is December 31, 1977 (the project was awarded in December, 1975, with an original completion date of April, 1977). To meet medical assistance care standards, Pennsylvania is planning to expend an additional $2,367,500. (Rice, N.T. 26–6). The institution is presently in jeopardy of losing its current certification if the waivers it presently has, contingent on repairs being made, are withdrawn. (Id., at 26–13, 26–14).

15. The statistics set forth in this paragraph are taken from a systematic sampling of 10% of the resident population at Pennhurst. (PARC Exhibit 48).

16. It is unclear what percentage of the residents have family members still living.

17. See text following note 5, supra.

18. It appears that the Vineland has an inherent bias against retarded individuals from age ten through twenty-five, in that social quotients over this period, as measured by the Vineland, have a tendency to decline. (Hare, N.T. 8–195, 8–196). This phenomena ceases once the individual reaches the age of twenty-five. (Id., N.T. 8–203). An analysis of those Pennhurst

At its best, Pennhurst is typical of large residential state institutions for the retarded.[19] These institutions are the most isolated and restrictive settings in which to treat the retarded. (Lancaster-Gaye, N.T. 4–79). Pennhurst is almost totally impersonal. (*Id.*, N.T. 4–71). Its residents have no privacy (Roos, N.T. 1–149)—they sleep in large, overcrowded wards (Youngberg, Deposition at 22), spend their waking hours together in large day rooms and eat in a large group setting. (Clements, N.T. 2–57, 2–71, 2–72). They must conform to the schedule of the institution which allows for no individual flexibility. Thus, for example, all residents on Unit 7[20] go to bed between 8:00 and 8:30 p. m., are awakened and taken to the toilet at 12:00–12:30 a. m. and return to sleep until 5:30 a. m. when they are awakened for the day (Barton, Deposition at 21–26, 33–34; Roos, N.T. 1–50), which begins with being toileted and then having to wait for a 7:00 a. m. breakfast.

## A. *Staffing*

On the whole, the staff at Pennhurst appears to be dedicated and trying hard to cope with the inadequacies of the institution. (Hersh, N.T. 13–130).[21] Many of the problems at Pennhurst result from overcrowding and understaffing.[22] As professionals leave the staff, they are often not replaced, their jobs being turned over to direct care staff; thus, in the last two years nineteen professionals have left the staff without being replaced. (Roos, N.T. 1–153). Nearly every witness who testified concerning Pennhurst stated that it was grossly understaffed to adequately habilitate the residents. None of the standard reference sources now generally used by professionals in the field of mental retardation define the qualifications and minimal numbers of mental retardation professionals necessary to provide minimally adequate programs of habilitation. (Clements Report at 6). However, the court in *Wyatt v. Stickney*, 344 F.Supp. 387 (N.D.Ala.1972), attempted to provide such guidelines. A comparison of the *Wyatt* ratios to those at Pennhurst in 1975[23] reveals:

|    |                        | Wyatt Standards | Pennhurst |
|----|------------------------|-----------------|-----------|
| a. | Psychologists          | 23              | 23        |
| b. | Social Workers         | 40              | 6         |
| c. | Vocational Therapists  | 5               | 4         |
| d. | Recreation Therapists  | 23              | 0         |
| e. | Occupational Therapists| 18              | 10        |
| f. | Registered Nurses      | 95              | 54        |
| g. | Physicians             | 7               | 6         |
| h. | Physical Therapists    | 14              | 2         |
| i. | Speech and Hearing Therapists | 14       | 9         |
| j. | Dentists               | 7               | 4         |
| k. | Chaplains              | 7               | 4         |
| l. | Teachers[24]           | 51              | 8         |

(Clements, N.T. 2–26, 2–27).

---

residents who had received at least two Vineland examinations since their twenty-fifth birthday showed an average regression of 2.3 points. (*Id.*, N.T. 9–16).

19. Dr. Gunnar Dybwad, who has visited institutions for the retarded in 49 states testified that Pennhurst was in the bottom category of the large residential state institutions for the retarded. (N.T. 7–62).

20. Pennhurst is organized around the unit system and is composed of nine units, representing various levels of educational and behavioral development and physical handicap. (United States of America Exhibit 10).

21. As defendants themselves have expressed it: "The staff at Pennhurst is a dedicated lot with precious little to work with." Commonwealth Defendants' Post-Trial Proposed Findings of Fact and Legal Arguments at 5.

22. In his budget proposal for fiscal year 1977–78, Superintendent Youngberg requested 23 additional ward clerks, 1 additional unit secretary and 717 mental retardation aides. (Youngberg, Deposition at 42).

23. There was no testimony that these ratios have changed dramatically in the intervening two years, though 19 professional positions have been eliminated since Dr. Clements' tour of Pennhurst. (Roos, N.T. 1–153).

24. In 1975, 206 school·age residents were enrolled in the school program operated by IU teachers. There teachers were excluded from the calculation.

No psychologists are on duty at Pennhurst at night or over the weekend, thus, if a resident has an emotional crisis, he or she may go without treatment until the next morning or until the weekend is over. (Riznyk, N.T. 17–182). Moreover, routine housekeeping services are not available during evenings and weekends, thus it is common to find urine and feces on ward floors over these periods. (Smith, Deposition at 41; Roos, N.T. 1–158).

## B. Habilitation at Pennhurst

All parties to this litigation are in agreement that Pennhurst as an institution is inappropriate and inadequate for the habilitation of the retarded. It is also admitted that the inadequacies in programming at Pennhurst are directly attributable to staff shortages. Residents' records commonly contain a notation that they would benefit from specific types of programming. However, such programming has, for the most part, been unavailable to the individual because of staff shortages. (Foster, Deposition at 42; DeAngelis, N.T. 16–49). The average resident receives only 1½ hours of programming per weekday and no programming on weekends. (Thurman, N.T. 14–60; DeAngelis, N.T. 16–31). No one, except those in school, gets more than 3½ to 4 hours per day. If one factors out those programs which are not considered beneficial, the average drops to about fifteen minutes per day. (Thurman, N.T. 14–60).[25]

Some residents receive no programming due to their extreme hyperactivity, medical problems, or their own refusal of treatment. (DeAngelis, N.T. 16–32; Cooper, N.T. 29–46). Some individuals have not been accepted into occupational therapy, since only group programs are available and they require individual attention. Some Pennhurst residents have been dropped from existing programs due to lack of progress and motivation. The record indicates that the residents at Pennhurst are made to fit into existing programs, and that the programs are not altered to fit the needs of the individuals. Further, it appears that an individual's motivation and not his or her needs determine whether the resident continues with the program. (Hare, N.T. 8–180, 8–181).[26]

Residents are referred to special programs at Pennhurst, but often, due to staff shortages, placements are not made. (DeAngelis, N.T. 16–40, 16–41). Almost every service offered at Pennhurst has a long waiting list. (Foster, Deposition at 42). For example, as of April 15, 1977, there were 511 residents on the referral list for occupational therapy. (Hilker, N.T. 20–43). While 50–60 Pennhurst residents have wheelchairs which have been individually adapted to meet the individual's needs, 75–100 residents need such adaptions. (Fekula, N.T. 20–99). The consequences for the resident not having his or her wheelchair adapted are especially grave, including: (1)

25. For example, the programming for residents on Unit 8, the unit in which the most aggressive residents reside, includes several hours per day during which the residents watch TV. Mr. Pirmann the Director of the unit, testified that this was to increase the residents' attention span and to teach them to sit and tolerate the presence of others. (N.T. 19–104, 19–105). "Programming" such as this appears to be primarily for the convenience of the staff, rather than for the benefit of the residents. (Thurman, N.T. 14–68).

26. George Sorotos, a named plaintiff, was enrolled in speech therapy at the end of 1972. At that time, he was unable to communicate, and his program was designed to develop his communicative skills. Though initially he made progress, he soon plateaued. In August, 1973, he was switched to a manual communication program. This continued for six months, again with some initial success. During each program, he was self abusive, which the staff attributed to frustration. He was never able to use these skills for communication. George Sorotos was terminated from all speech activity because the director of the speech and hearing department determined that her time would be better spent with other residents with whom she could accomplish more. (Riggott, N.T. 20–160 to 20–164). Thus, since George Sorotos did not respond well and was self abusive, he was denied speech therapy, a skill essential for his habilitation.

Similarly, plaintiff Terri Lee Halderman was initially included in speech therapy, but because of abusive tendencies, both to herself and to others, she was dropped from the program. (Id., N.T. 20–164 to 20–166).

loss of vital functions; (2) severe muscular contractions; and (3) loss of ability to be programmed. (*Id.*, N.T. 20–101). While over 300 residents at the institution have hearing impairments, only 51 have been fitted with hearing aids. There are 106 residents on the waiting list for speech therapy, and nearly every resident at Pennhurst could benefit from some type of communication programming. (Riggot, N.T. 20–155).[27] Three to four hundred residents presently need physical therapy to prevent physical deterioration, however, only 143 are receiving this therapy. (Rossi, Deposition at 12, 22).[28]

Pennhurst has established a communication center for 22 non-verbal individuals, but the institution has approximately 300 non-verbal residents. In theory, the residents in the communication center spend their day in classes learning signing (*i. e.*, sign language skills), academics, and self-care skills. However, when there is only minimal staff coverage, classes are not offered since the staff is totally occupied with custodial tasks. During the month of April, 1977, there were 5 days during which there was minimal coverage on the first shift (7:00 a. m.—4:00 p. m.); 25 days of minimal coverage on the second shift (4:00 p. m.—11:00 p. m.); and thirty days of minimal coverage on the third shift (11:00 p. m.—7:00 a. m.)—on five of these days during the third shift, there was less than minimum staff coverage. (Nelson, N.T. 21–23, 21–24).

Not only is the programming at Pennhurst inadequate to meet minimum profes-

sional standards (Rice, Deposition at 179, 180), but so are the evaluations performed on the residents to determine what is required to adequately habilitate the individual. None of the residents at Pennhurst had a full multi-discipline assessment as of January, 1977. (PARC Exhibit 53; Flueck, N.T. 4–9). Twenty and six-tenths percent of the residents have not received a limited multi-discipline assessment since January, 1975, and those assessments which have been made are generally limited to psychological, speech and hearing skills and are rarely concerned with vocational or self-care skills. (Hare, N.T. 8–165, 8–166). Proper habilitation cannot be provided to retarded persons unless those responsible for providing such programs are aware of the individual's needs.

Defendants have not made "full exit plans," *i. e.*, plans delineating: (1) a place for each individual to live outside of Pennhurst; (2) the daily activity necessary for each individual living outside Pennhurst; (3) necessary support services; and (4) the person who would be responsible, for any Pennhurst resident.[29] Such plans are very important in planning for the resident's eventual return to the community from the institution.

Defendants have also failed to make full "program plans," *i. e.*, plans containing: (1) identification of long and short term goals; (2) specification of the conditions under which the individual might achieve these goals; and (3) specification of the criteria to evaluate the individual's mastery of the goals, for Pennhurst residents.[30]

---

**27.** Some residents have been on the waiting list for at least 3½ years. (Nelson, N.T. 21–27).

**28.** Pennhurst does an especially inadequate job for those with motor disabilities. Dr. Lancaster-Gaye, an expert in, among other things, the management of services for severely disabled persons (N.T. 4–69), toured the institution in March, 1977 and reported that young retarded individuals who suffered from cerebral palsy were sitting on the floor in positions which would lead to physical deterioration. He stated that these individuals were receiving little physical therapy and that without such therapy, the muscles in the limbs of these youths

would contract and become useless. (N.T. 4–74, 4–75).

**29.** Sixty and eight-tenths percent of the residents had no mention of the community or of an exit plan in their files, and those that had some indication that the individual's eventual exit from the institution had been considered, never specified the type of placement which would be required nor who would be responsible for the individual. (Hare, N.T. 8–167).

**30.** Twenty-eight and nine-tenths percent had no program plan. Those that did have some plan rarely had a precise statement of goals and objectives. (Hare, N.T. 8–166).

The record keeping at Pennhurst is also below acceptable minimum standards. (Clements, N.T. 2–22). Adequate record keeping is essential for proper habilitation of the residents.[31] Without such records, the staff will not know what the individual is already able to do, what type of care he or she should be receiving, and how to evaluate progress made by the individual. (*Id.*)

Pennsylvania's immediate plans for Pennhurst call for a reduction of the population at the institution to 850 [32] and to provide, by July 1, 1978, 2½ hours of programming per resident per day. Dr. Rice, the Commissioner of Mental Retardation for Southeast Pennsylvania felt that such programming would fulfill the minimum requirements to qualify for medical assistance (*i. e.*, federal financing). However, he knew of no other set of standards which would consider this level of programming minimally acceptable, and personally did not feel that it was adequate. (N.T. 27–78). As a matter of practice, the Department of Mental Retardation for the Southeast Region will not approve a community living arrangement for a mentally retarded individual unless it provides for programming of at least five and one-half hours per day. (Rice, N.T. 27–80).

## C. *Restraints at Pennhurst*

At Pennhurst, restraints are used as control measures in lieu of adequate staffing.[33] (Clements, N.T. 2–82, 2–84; Roos, N.T. 1–135; Sprague, N.T. 3–44; Hersh, N.T. 13–

153, Foster, Deposition at 81). This is not to say that restraints should never be used in the habilitation of the retarded. When an individual's aggressive behavior interferes with his or her ability to take advantage of other programming which the individual should receive, or poses a physical threat to him or herself and others it may be proper to restrain that person. Soon, it is hoped, once the individual has benefited from the other programming, the restraint will not be needed. (Clements, N.T. 2–86). It is generally conceded that most, if not all, outbursts of violence by the retarded can be prevented by adequate programming.

Seclusion rooms [34] have been used to punish aggressive behavior. One eighteen year old individual spent six consecutive days in seclusion in 1974 for assaulting a Down's Syndrome resident. (Lowrie, N.T. 5–6, 5–7). In 1975, a committee was formed to investigate the use of seclusion rooms at Pennhurst. It recommended that seclusion rooms, if they were to be used at all, should be limited to medical emergencies and should not be utilized for punishment. (Lowrie, N.T. 5–5). Seclusion rooms are still in use at Pennhurst (M. Conley, N.T. 16–150; Boyle, N.T. 17–72, 17–73; L. Miller, N.T. 77–102; Malone, N.T. 17–140, 17–141; Lowrie, N.T. 5–71), though the incidence of their use is less than it was in years past. There is now a policy that seclusion rooms be used only for medical emergency, when a resident becomes ex-

---

**31.** An individual's record should contain: (1) a current comprehensive evaluation of the individual; (2) a list of short and long term goals for the individual; (3) a specific plan outlining the procedures to accomplish these goals. The program should also provide for on-going monitoring, periodic re-evaluations of the individual, and periodic modifications of the objectives and procedures to reflect the findings of the re-evaluations. (Roos, N.T. 1–115, 1–116).

**32.** Decreasing the population to 850 is contingent on an increase in funds appropriated by the Pennsylvania legislature, along with an ambitious placement program—unfortunately much of this placement is from one institution (Pennhurst) to other institutions rather than to the community.

**33.** Restraints can be either physical or chemical. The physical restraints range from placing the individual into a seclusion room to binding the person's hands or ankles with muffs or poseys, and binding the individual to a bed or a chair. Chemical restraints are usually psychotropic (*i. e.*, tranquilizing) drugs.

**34.** The seclusion rooms at Pennhurst are small rooms generally with one window and one door. The walls are masonry, the floors either tile or terrazzo—both hard surfaces. None of the rooms are padded. Many have exposed radiators, and other potentials for danger to the resident placed within it. (Youngberg, Deposition at 69; Lowrie, N.T. 4–183 to 4–190).

tremely abusive, and no other alternative will control the individual. One-to-one interaction with staff members is often effective in calming the resident and stopping this maladaptive behavior. However, since normally the wards are, at best, minimally staffed, there frequently is not a staff person who can be spared to participate in this intensive interaction. (Lowrie, N.T. 5–9; Miller, N.T. 17–122). Thus, seclusion is often necessary only because there is insufficient staff. (Lowrie, N.T. 4–131).[35]

Often physical restraints are also used due to staff shortages. An extreme example is a female resident who, during the month of June 1976, was in a physical restraint for 651 hours 5 minutes; for the month of August, 1976, was in physical restraints for 720 hours; during September, 1976, was in physical restraints for 674 hours 20 minutes; and during the month of October, 1976, was in physical restraints for 647 hours 5 minutes. (Matthews, Deposition at 64–68). This resident was extremely self-destructive—she totally blinded herself. She was not enrolled in occupational therapy until early 1977. Once initiated, her programming has apparently been quite successful, and she is now able to be out of restraints for as much as four hours per day. (Foster, N.T. 23–43). Had this programming been initiated earlier, her self-inflicted injuries might have been avoided or at least lessened.

Physical restraints are potentially physically harmful and can create conditions in which physical injuries are more likely to occur (Clements, N.T. 2–87; Hirst, N.T. 7–131; Roos, N.T. 1–166),[36] and prevent residents from learning or exercising self-care skills. (Clements, N.T. 2–87).

Psychotropic drugs at Pennhurst are often used for control and not for treatment, and the rate of drug use on some of the units is extraordinarily high. (Hersh, N.T. 13–153).[37] Dr. Sprague, an expert in psychopharmacology,[38] testifying on behalf of the United States, conducted a survey of 39 residents at Pennhurst, a group which he considered to be statistically representative of the residents at Pennhurst. He found that 51% of the group were receiving psychotropic drugs, 35% of the group were receiving anti-convulsant medication, and 40% were receiving two or more psychotropic drugs at one time. (N.T. 3–36). In comparison with similar institutions throughout the country, Dr. Sprague stated that these percentages were very high, though he said that some institutions administer comparable levels.[39]

Dr. Sprague also found that Pennhurst residents on drugs were inadequately monitored. Without monitoring, one cannot determine whether the drug has been effective and whether it should be continued. Dr. Sprague found that in only 29% of the cases in which a drug was administered

---

**35.** One young male resident had a tendency to run away from the institution. When he was given one-to-one interaction with staff, he would not attempt to run away. When the program of one-to-one interaction was dropped due to staff shortages, he again began running away. He was warned that he would be put on a locked ward if his behavior continued, and he became abusive to staff. As a result of this behavior, he was put into a seclusion room. (Foster, N.T. 22–44 to 22–46).

**36.** In 1972, an eleven year old child strangled to death when tied to a chair in "soft" restraints. (Lowrie, N.T. 4–133—4–135).

**37.** Until March, 1977, Pennhurst had no written policy against the use of PRN orders ("*pro re nata*" or "as needed") for restraints or seclusion. In its most extreme form, a doctor would prescribe a restraint or seclusion for a patient

to be administered in the discretion of a direct care aide or a nurse. (Boyle, N.T. 17–93, 17–94). At best, the doctor would be called prior to administration of the drug, but he or she seldom personally visited the resident either before or shortly after the medication or physical restraint was administered. (Boyle, Deposition at 22).

**38.** "Psychopharmacology" is the area of study dealing with prescription medicines that are prescribed for mind alteration for behavior control. (Sprague, N.T. 3–12, 3–13).

**39.** Dr. Sprague testified that at a state institution in Georgia serving the most severely retarded individuals, only 25% of the residents were on drugs. (N.T. 3–38).

were its effects on the individual evaluated. (N.T. 3–45). He further testified that the drug practice at Pennhurst does not meet minimally professional standards and is physically hazardous to the residents. (N.T. 3–55, 3–90).

One of the side effects of the use of psychotropic medication is that it may make the individual receiving it lethargic—so much so that the recipient may fall asleep during school, or during other times when activities and/or programming are being attempted. (Lowrie, N.T. 5–22). Other hazardous side effects of these drugs include hypersensitivity to sunlight; ataxia (inability to maintain balance and gait); and gingival hyperplasia (gum tissue condition marked by inflammation, bleeding and increased growth). (Hedson, Deposition at 59–61). Thus, the administration of such drugs actually impedes the habilitation of the resident, especially when used as a control rather than a habilitation device.

### D. *Deterioration and Abuse of the Residents at Pennhurst*

The physical environment at Pennhurst is hazardous to the residents, both physically and psychologically. (Clements, N.T. 2–59). There is often excrement and urine on ward floors (Roos, N.T. 1–158; Smith, Deposition at 41), and the living areas do not meet minimal professional standards for cleanliness. (Youngberg, Deposition at 24). Outbreaks of pinworms and infectious disease are common (M. Conley, N.T. 16–193; Lowrie, N.T. 4–153; Hedson, Deposition at 122). As Superintendent Youngberg noted:

> There is not adequate space for [the residents. The living areas do] not provide privacy for those persons who can handle privacy. There does not seem to be adequate activity areas or program areas or

even general activity areas within the general living area or even adequate activity program areas away from the home living area. (Deposition at 23).

The environment at Pennhurst is not only not conducive to learning new skills, but it is so poor that it contributes to losing skills already learned.[40] (Clements, N.T. 2–59). For example, Pennhurst has a toilet training program, but one who has successfully completed the program may not be able to practice the newly learned skill, and is therefore likely to lose it. (Clement, N.T. 2–36, 2–37). Moreover, most toilet areas do not have towels, soap or toilet paper,[41] and the bathroom facilities are often filthy and in a state of disrepair. Obnoxious odors and excessive noise permeate the atmosphere at Pennhurst. Such conditions are not conducive to habilitation. (Dybwad, N.T. 7–52). Moreover, the noise level in the day rooms is often so high that many residents simply stop speaking. (Clements, N.T. 2–59).

Meals are eaten in a large group setting. Staff supervision is at a minimum, and residents are often free to steal food from other residents—which results in some residents not getting enough to eat. (Clements, N.T. 2–73). Obviously, diet control in such an environment is almost impossible.

Injuries to residents by other residents, and through self-abuse, are common. For example, on January 8, 1975, one individual bit off three-quarters of the earlobe and part of the outer ear of another resident while the second resident was asleep. (Matthews, Deposition at 83). About this same period, one resident pushed a second to the floor, resulting in the death of the second resident. (Barton, Deposition at 67, 68). Such resident abuse of residents continues. In January, 1977 alone, there were

---

40. A survey conducted by Dr. Betty Hare revealed that 34% of the individuals in the group surveyed had some notation of regression in their records. (PARC Exhibit 53, Hare, N.T. 8–167). Those "skills" which are learned at Pennhurst are often antisocial. (Roos, N.T. 1–139; Clements, N.T. 2–84).

41. Direct care aides testified that there was no soap or towels in the toilet areas because when placed there, the residents stuffed them down the toilets. (Roy, N.T. 15–108). These same aides also testified, however, that no programming had been conducted to try to negate this behavior. (*Id.*, N.T. 15–127).

833 minor and 25 major injuries reported.[42] (Youngberg, Deposition at 83).

In addition, there is some staff abuse of residents. In 1976, one resident was raped by a staff person (Ruddick, N.T. 3–115 to 3–117); one resident was badly bruised when a staff person hit him with a set of keys (Barton, Deposition at 40); another resident was thrown several feet across a room by a staff person (Ruddick, N.T. 3–113; Caranfa, N.T. 12–79); and one resident was hit by a staff person with a shackle belt (Bowman, N.T. 13–83; Pirmann, N.T. 19–94). On each occasion, an investigation was conducted and the staff person responsible was suspended and/or terminated (Ruddick, N.T. 3–114; Bowman, N.T. 13–82, 13–83, 13–84; Pirmann, N.T. 19–94).

Many of the residents have suffered physical deterioration and intellectual and behavioral regression during their residency at Pennhurst. Terri Lee Halderman, the original plaintiff in this action, was admitted to Pennhurst in 1966 when she was twelve years of age. During her eleven years at Pennhurst, as a result of attacks and accidents, she has lost several teeth and suffered a fractured jaw, fractured fingers, a fractured toe and numerous lacerations, cuts, scratches and bites.[43] Prior to her admission to Pennhurst, Terri Lee could say "dadda", "mamma", "noynoy" (no), "baba" (goodby) and "nana" (grandmother). She no longer speaks. (Halderman, N.T. 9–69, 9–71, 9–78, 9–87, 9–88).

Plaintiff Charles DiNolfi was admitted to Pennhurst when he was nine years old; he is now forty-five and has resided at the institution continually except for short stays at White Haven State School and Hospital. (Hunsicker, N.T. 9–39). Dorothy Hunsicker, his sister, testified that whenever she or her family visited him, Mr. DiNolfi had some type of bandage on. (*Id.*) Twenty-six years ago, while at Pennhurst, Mr. DiNolfi lost an eye. A Pennhurst physician told Ms. Hunsicker that Mr. DiNolfi slipped while taking a shower, and hit the spigot with his eye. The sight in his remaining eye has been impaired due to injury. (*Id.*, N.T. 9–46, 9–47). He has only a few teeth remaining and his nose has been battered. (*Id.*, N.T. 9–41).

Plaintiffs Robert and Theresa Sobetsky were admitted to Pennhurst on November 29, 1971.[44] They were placed on extremely overcrowded wards where beds were placed in the aisles. Robert was never assigned to a particular bed. (Sobetsky, N.T. 9–145, 9–146). During his residency at Pennhurst, Robert Sobetsky suffered from bruises, bites, scratches, welts and he smelled of urine. (*Id.*, N.T. 9–147, 9–148). His record shows a number of reported injuries, some of which, though labeled minor injuries, represented bruises that were three to five inches in length. (*Id.*, 9–151, 9–152). Theresa also suffered such injuries. (*Id.*, N.T. 9–148).

Plaintiff Robert Hight, born in 1965, was admitted to Pennhurst in September, 1974. He was placed on a ward with forty-five other residents. His parents visited him two and one-half weeks after his admission and found that he was badly bruised, his mouth was cut, he was heavily drugged and did not recognize his mother. On this visit, the Hights observed twenty-five residents walking the ward naked, others were only partially dressed. During this short period of time, Robert had lost skills that he had possessed prior to his admission. The Hights promptly removed Robert from the institution, Mrs. Hight commenting that she "wouldn't leave a dog in conditions like that." (N.T. 11–22, 11–23).

Plaintiff George Sorotos entered Pennhurst in 1970 at the age of seven. In the seven years that George has been at Pennhurst, his former foster mother, Marion

---

**42.** This figure includes injuries due to self-abuse and to accidents.

**43.** Terri Lee Halderman's medical records contain a listing of over forty reported injuries.

**44.** Since January, 1976, they have been residing at Woodhaven, a Pennsylvania institution for the mentally retarded run by Temple University.

Caranfa,[45] testified that in her weekly visits to Pennhurst there have been only four occasions when George was not injured. (N.T. 12–63). During this period, he has suffered from numerous reported injuries, including bites, scratches, black eyes and loss of teeth. In addition, Mrs. Caranfa testified that she recently observed what appeared to be cigarette burns on George's chest. (N.T. 12–65).

Plaintiffs Larry and Kenny Taylor entered Pennhurst on February 28, 1961. In the early 1970's, Mrs. Taylor questioned the staff about the medication being given to Larry. He was very lethargic, falling asleep at school and barely able to walk. (Taylor, N.T. 13–24). The physician in charge of Larry's unit, checked Larry's medical record and found that he was on dilantin, a drug used to control epileptic seizures. Mrs. Taylor testified that Larry had had only one seizure that she knew of and that had been when he was a baby. Larry was removed from dilantin and placed on mellaril, a psychotropic drug. This, too, made him lethargic. (*Id.*, N.T. 13–26 to 13–28). Larry and Kenny were transferred to Woodhaven in 1975 where Mrs. Taylor testified that Larry does not receive any psychotropic medication, and is able to walk independently. (*Id.*, N.T. 13–32). Larry was often injured while at Pennhurst; on one occasion, he was hospitalized for two weeks because of head and face injuries he received as a result of a beating by another resident. (*Id.*, N.T. 13–30). Kenny, too, suffered serious injuries while at Pennhurst. (*Id.*, 13–29).

Plaintiff Nancy Beth Bowman entered Pennhurst at the age of ten in 1961. She was placed on a large ward which had sixty-five residents and often only two child-care aides in attendance. (Bowman, N.T. 13–71; Pirmann, N.T. 19–89). During her residency at Pennhurst she developed maladaptive behavior, *i. e.*, biting and pushing. (Bowman, *Id.*) As a result of this maladaptive behavior she has been placed in seclu-

sion for days at a time. (*Id.*, N.T. 13–71). While at Pennhurst, she has lost teeth, been badly bruised and has been abused by the staff. (*Id.*, N.T. 13–72, 13–73, 13–81). When asked about her present physical condition Nancy Beth's mother replied, "Nancy Beth will be scarred for the rest of her life." (*Id.*, N.T. 13–94).

Plaintiff Linda Taub, who is blind in addition to being retarded, was admitted to Pennhurst in 1966 at the age of fifteen. According to her father, during her nine year residency at Pennhurst Linda received only custodial care and she experienced regression rather than growth. (Taub, N.T. 2–170). Time on the ward was spent sitting and rocking, with few activities. (*Id.*, N.T. 2–155). During one of their visits in 1968, Linda's parents found Linda, a person capable of walking, strapped to a wheelchair by a straightjacket. A staff member explained that by strapping her into the chair, they would know exactly where Linda was. (*Id.*, N.T. 2–152, 2–153). While at the institution, Linda was badly bruised and scarred. (*Id.*, N.T. 2–164).

### E.  *Voluntariness*

Approximately 21 of the 45 living units at Pennhurst are locked (Matthews, Deposition at 34) to prevent individuals from leaving their living units. (Uphold, Deposition at 139). Those individuals over the age of 18 who have been "voluntarily" admitted to Pennhurst are theoretically free to leave the institution at any time. (Allen, N.T. 21–185). Those admitted on the petition of their parents are informed by their caseworker when they reach the age of 18 that they do not have to remain at Pennhurst. If the residents state that they wish to leave the institution and the staff determines that there is no place for them in the community, or believes that the individuals are not ready to go into the community, the staff will petition the courts to have the individuals committed to the institution by a court. (*Id.*, N.T. 21–186, 21–205). Fur-

---

**45.** The Caranfas were made George Sorotos' foster parents when he was six weeks old. Sometime after he entered Pennhurst, the agency which had supervision over George re-

moved them as his foster parents. They still consider him as one of their family and have continued their visits. (Caranfa, N.T. 12–62, 12–105).

thermore, those residents who either do not understand their alternatives, or are physically unable to indicate that they wish to leave Pennhurst, will be deemed to have consented to their continued placement at the institution. (*Id.*, N.T. 21–210). Thus, the notion of voluntariness in connection with admission as well as in connection with the right to leave Pennhurst is an illusory concept. Few if any residents now have, nor did they have at the time of their admission, any adequate alternative to their institutionalization. As a practical matter, Pennhurst was and is their only alternative.[46]

F. *Community Services in the Five County Area*

Since the early 1960's there has been a distinct humanistic renaissance, replete with the acceptance of the theory of normalization for the habilitation of the retarded. Mason & Menolascino, *supra* note 6, at 136. The principles of normalization are an outgrowth of studies showing that those in large institutions suffered from apathy, stunted growth and loss in I. Q., and that the smaller the living unit on which the retarded individual lived, the higher the level of behavioral functioning shown by the individual. (Roos, N.T. 1–96 to 1–104). Under the principles of normalization, the retarded individual is treated as much like the non-retarded person as possible. (*Id.*, N.T. 1–106, 1–107). The basic tenet of normalization is that a person responds according to the way he or she is treated. (Glenn, N.T. 5–186, 5–187). The thrust of habilitation through normalization is the remediation of the delayed learning process so as to develop the maximum growth potential by the acquisition of self-help, language, personal, social, educational,

vocational and recreation skills. Mason & Menolascino, *supra* note 6, at 139–140. The older theories of habilitating the retarded stressed protecting the individual, and were characterized by little expectation of growth. Given this lack of expectation, the individual rarely exhibited growth. However, once removed from depressing, restrictive routines, the retarded have been able to accomplish a great deal. (Dybwad, N.T. 7–160).[47]

The environment at Pennhurst is not conducive to normalization. It does not reflect society. It is separate and isolated from society and represents group rather than family living. (Hirst, N.T. 7–124). The principles of normalization have been accepted by the administration of Pennhurst and by the Department of Public Welfare, which is responsible for the administration of programs for the retarded in the five county area (Youngberg, N.T. 22–171; Rice, N.T. 26–43 to 26–45; Bilyew, N.T. 24–13; Hirst, N.T. 7–120), and the current intention of the Department of Public Welfare is to transfer all residents from Pennhurst by the early 1980's. (Rice, N.T. 28–48).

The five county area (Bucks, Chester, Delaware, Montgomery and Philadelphia) has some community facilities providing for the education, training and care of the retarded covering all ages of retardation, including the profoundly retarded with multiple handicaps. (Girardeau, N.T. 4–140, 4–141). These community facilities have been an outgrowth of the acceptance of the principle of normalization and the rejection of institutions such as Pennhurst in connection with the habilitation of the retarded.

Many individuals now living at Pennhurst could be moved immediately into the community and would be able to cope with little

---

46. Nearly all the parents of Pennhurst residents who testified stated that they placed their children in Pennhurst only as a last resort, and had there been community facilities or aid programs, their children would not have been placed at Pennhurst. (Sobetsky, N.T. 9–142; Hight, N.T. 11–21).

47. Mrs. Grace Auerback testified concerning the changes she has observed in her son, Sid,

since his transfer from Pennhurst into a community home in 1973. While at Pennhurst, he was subdued and never talked; now, she testified, you cannot stop him. He is now able to cook, work and keep his own bank account. She testified that Sid had learned more in the last 3½ years while in the community than he had in the 38 years that he had resided at Pennhurst. (N.T. 8–47, 8–48, 8–49, 8–51).

or no supervision. (Settle, N.T. 6–126; Hirst, N.T. 7–116). All the parties in this litigation are in agreement that given appropriate community facilities, all the residents at Pennhurst, even the most profoundly retarded with multiple handicaps, should be living in the community. (Dybwad, N.T. 7–68).

The primary limiting factor in the transfer of Pennhurst residents to community facilities has been the failure of the Commonwealth and its subdivisions to provide sufficient living units, vocational and day care facilities and other support services at the community level. Since fiscal year 1972, only 186 Pennhurst residents have been transferred from the institution directly into community living units (Bilyew, N.T. 24–50); although 176 others were transferred from Pennhurst to other institutions during 1974 and 1975. (Clark, N.T. 21–170).

In November, 1970, Act 256 was signed by the Governor of Pennsylvania. This legislation appropriated twenty-one million dollars for the purpose of planning, designing and constructing community facilities which would enable 900 Pennhurst residents to be transferred to the community. In 1971, the McDowell report was prepared at a cost of $68,000. It detailed the programs and services needed to support the 900 Pennhurst residents in the community and provided a blueprint for the implementation of the Act. (Samuels, N.T. 23–9, 23–10, 23–55). Though seven years have passed since the Act was signed, few of the facilities have become operational. The Department of Public Welfare now expects this program to be completed by 1980. (*Id.*, N.T. 23–44). Over eighteen million dollars of this fund remains unspent but is allocated to building these facilities. (Stipulation, N.T. 7–97). As of April 25, 1977, however, only 37 Pennhurst residents have directly benefited from the Act. (Samuels, N.T. 23–80).

Comparable facilities in the community are generally less expensive than large isolated state institutions. Services can be purchased at regular rates, rather than at rates which must be paid to attract individuals to work in a setting like Pennhurst. (Conley, N.T. 11–107). The cost of running Pennhurst in 1976 was $27.8 million dollars, or $60 per resident per day. (*Id.*, N.T. 12–28). This does not include the fair rental value of the buildings at Pennhurst (estimated at $3–$4 per resident per day). (*Id.*, N.T. 11–114). The statewide cost of community living arrangements in Pennsylvania for 1976 was $17.64 per individual per day. (PARC Exhibit 63, 64). Program services, which ⅓ of mentally retarded individuals would need, average approximately $10 per individual per day. (Conley, N.T. 11–116, 11–117). Moreover, keeping the retarded individual in the community makes it possible for him or her to get employment. Eighty-five percent of the mentally retarded can be employed, though not all are capable of competitive employment. (Settle, N.T. 7–4). The lifetime earnings of a mildly retarded individual often exceeds $500,000. (Conley, N.T. 12–21). For those with an I.Q. between 25 and 50, 45% of men and 12% of women earn about 20% of the average wage. (*Id.*, N.T. 12–31). When the retarded can work, the amount of financial support which society must provide decreases and the individuals may benefit society with the taxes they pay. Furthermore, the investment per individual at Pennhurst is primarily for warehousing and not for the individual's well-being or future planning, as is the case with community facilities. (*Id.*, N.T. 11–23, 11–24).

### G. County Participation

The counties presently have a financial incentive to send their retarded to Pennhurst rather than provide them with habilitation within the community. When a retarded individual is placed in a state institution, such as Pennhurst, the Commonwealth pays 100% of the costs incurred in the habilitation of the individual. However, if the individual receives services within the community, the county must provide 10% of the funds necessary to provide some of the services.

Every mentally retarded individual within the Commonwealth is assigned to a Base Service Unit (BSU) which is the county unit responsible for arranging community and institutional placements and for coordinating services for the individual. (Rice, N.T. 25–67). Pennhurst residents are assigned to a BSU either on the basis of where they resided prior to admission to the institution, or where their family presently resides. Almost all of the parents of Pennhurst residents who testified stated that they had little or no contact with their child's BSU. (Hunsicker, N.T. 9–49; Taylor, N.T. 13–30). The BSU's are invited to attend their residents' annual program review, but almost never do. (Roy, N.T. 15–134; Hare, N.T. 8–176). The BSU's often fail to investigate the least restrictive alternative for the retarded individual under their charge. Placement at Pennhurst is often the only alternative presented to the committing judge at court commitment proceedings.[48]

The BSU's have been doing little to prepare Pennhurst residents to leave Pennhurst. Although the Pennsylvania Department of Public Welfare, Pennhurst staff and county officials are in complete agreement that the residents of Pennhurst should be transferred as soon as practicable to appropriate community facilities, apparently no one has taken the initiative to accomplish this objective. (Hersh, N.T. 13–136).

The five county defendants are not in compliance with the Commonwealth's Community Living Arrangement (CLA) policy that at least 50% of the residents for these living facilities must be drawn from institutions. In contrast to other regions in the state, the counties which Pennhurst serves have a lower percentage of CLA residents drawn from institutions than from the community. (Knowlton, Deposition at 52).

## IV. The Merits

This case concerns the constitutional and statutory rights of retarded persons institutionalized at Pennhurst. Our discussion herein pertains to the retarded, individuals who, because of circumstances beyond their control, are unable to function at the same educational and behavioral levels as the rest of society. It concerns solely the retarded and not persons who are mentally or emotionally ill. These are individuals who have not broken any laws, carry no contagious disease and are not in any way a danger to society. If anyone is in need of training, education and care, they are. At issue is whether the Commonwealth's system of incarcerating the retarded in an institution known as Pennhurst in any way violates their constitutional or statutory rights.

Having concluded the trial phase of the liability portion of this litigation, it has become apparent that by and large the parties share the same goals: all desire to improve the education, training and care provided the retarded in Pennsylvania and believe that Pennhurst should be closed and that all the residents should be educated, trained and cared for in the community. All agree that institutions such as Pennhurst are inappropriate and inadequate for the habilitation of the retarded. Defendants agree with plaintiffs' contention that the habilitation provided Pennhurst residents does not meet minimally acceptable professional standards. The Commonwealth in recent years has been attempting to upgrade Pennhurst and the education, training and care provided therein to its retarded residents. Moreover, the Pennsylvania Department of Public Welfare's current plans call for the transfer of all Pennhurst residents from the institution into the community (though perhaps temporarily into other institutions) by the early 1980's. Defendants contend, however, that they are neither constitutionally nor statutorily mandated to make these transfers or to upgrade the care, education and training provided at Pennhurst. It is their position that no constitutional or statutory rights have been violated. We disagree. More-

---

**48.** One Philadelphia BSU made a referral to Pennhurst for a child it had decided needed a structured environment with one-to-one inter- action, even though it knew that the individual would not receive such individualized treatment at Pennhurst. (Cooper, N.T. 29–74).

over, defendants' plans to upgrade and eventually close Pennhurst have little, if any, bearing on the issue of whether the statutory or constitutional rights of Pennhurst's retarded residents have been, or are being, violated. As the court in *Welsch v. Likins*, 373 F.Supp. 487, 498 (D.Minn.1974), *aff'd in part, vacated and remanded in part*, 550 F.2d 1122 (8th Cir. 1977), stated:

> good faith is not at issue here. "[R]ather the issue is of the protection of the constitutional rights" of the residents. . . . It does not suffice, therefore, to show that conditions have been upgraded at [the institution], that the situation will continue to improve in the future, and that even more achievements would be forthcoming were it not for the restrictions imposed by the legislature. It is the Court's duty, under the Constitution, to assure that every resident of [the institution] receives at least minimally adequate care and treatment consonant with the full and true meaning of the due process clause.

### A. Constitutional Right to Minimally Adequate Habilitation

The Supreme Court has not as yet stated that the retarded have a constitutional right· to habilitation. It has, however, discussed the right to treatment of the mentally ill. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Donaldson had been civilly committed to a state mental hospital in 1957 and had remained there involuntarily for nearly fifteen years. Repeatedly, but without success, he had demanded his release, contend-ing that he was neither dangerous nor mentally ill, and that even if he were mentally ill, that he should be released since the hospital had not provided him with treatment for his illness. The *Donaldson* holding is very narrow: "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *Id.* at 576, 95 S.Ct. at 2494.

Donaldson allegedly was suffering from "paranoid schizophrenia", *id.* at 565, 95 S.Ct. 2486, and was not retarded. When dealing with the retarded, the concern is for "habilitation" rather than for "treatment".[49]

> The use of the concept "habilitation" instead of "treatment" in the context of mental retardation reflects an awareness that "mental illness" is not synonymous with "mental retardation." Mental illness concerns an inability to cope with one's environment regardless of intellectual level. Mental illness can occur at any stage of life while mental retardation is considered to be a developmental disability beginning in the early years.

Mason & Menolascino, *supra* note 6, at 147 n. 72 (1976). Although we are convinced that the concept of "habilitation" for the retarded and "treatment" for the mentally and emotionally ill are separate and distinct concepts which should never be confused, in dealing with the question of the right of the retarded to adequate habilitation one must consider, to the extent applicable, those cases which deal with the right to treatment of the mentally ill.[50]

---

**49.** Often, those courts which have dealt with mentally ill and retarded individuals have blurred the issues involved. The "right to treatment" is frequently used in conjunction with the retarded, when in fact, these individuals are not in need of medical treatment, but of education and training. In part, this blurring is due to the fact that some of the cases involved several facilities, some for the retarded and some for the mentally ill, *see, e. g., Wyatt v. Stickney*, 325 F.Supp. 781 (M.D.Ala.1971) (mentally ill), 344 F.Supp. 387 (M.D.Ala.1972) (retarded), and others involved a single facility serving both retarded and mentally ill individu-als, *see e. g., Davis v. Watkins*, 384 F.Supp. 1196 (N.D.Ohio 1974).

**50.** Of course, as the Supreme Court has noted, "careful attention must be paid to the differences between mentally ill and mentally retarded . . . ." *Kremens v. Bartley*, 431 U.S. 119, 135, 97 S.Ct. 1709, 1718, 52 L.Ed.2d 184 (1977). However, as one court has noted: "[i]n the context of the right to appropriate care for people civilly confined to public mental institutions, no viable distinction can be made between the mentally ill and the mentally retarded." *Wyatt v. Stickney*, 344 F.Supp. 387, 390

A great deal of scholarly and judicial attention has been focused on the question of a constitutional right to treatment and habilitation since Dr. Morton Birnbaum's seminal work, *The Right to Treatment*, 46 A.B.A.J. 499 (1960).[51]

*Rouse v. Cameron*, 125 U.S.App.D.C. 366, 373 F.2d 451 (1966), was one of the first federal cases to deal with the right to treatment. Rouse had been involuntarily committed to a mental hospital following his acquittal by reason of insanity of a misdemeanor for which the maximum term of imprisonment was one year. Rouse filed a petition for habeas corpus which the district court denied, contending that he had a right to be released if he was not accorded adequate treatment. Although the Circuit Court reversed on the basis of a District of Columbia statute, Chief Judge Bazelon stated that "involuntary confinement without treatment is 'shocking'", *id.* 125 U.S.App. D.C. at 370, 373 F.2d at 455, and noted that the purpose of involuntary hospitalization is treatment and not punishment. *Id.* 125 U.S.App.D.C. at 367, 373 F.2d at 452. He pointed out that a statute which provides for the mandatory commitment of an individual acquitted of a criminal offense by reason of insanity is permissible only because of its "humane therapeutic goals," and concluded that if treatment were not required under the statute, the statute might violate the Due Process, Equal Protection and Cruel and Unusual Punishment

Clauses of the Constitution. *Id.* 125 U.S. App.D.C. at 368, 373 F.2d at 453.

■ Civil commitment entails a "massive curtailment of liberty". *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972). The only permissible justifications for committing the mentally ill are: (1) danger to the individual, (2) danger to others, and (3) need for treatment. *Jackson v. Indiana*, 406 U.S. 715, 737, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972); *Wyatt v. Aderholt*, 503 F.2d 1305, 1312 (5th Cir. 1974). Although this Court entertains serious doubts as to whether retarded individuals should ever be subjected to "commitment", there is no doubt that under the present case law, the only possible justification for committing the retarded to an institution such as Pennhurst is to provide them with habilitation, *i. e.,* education, training and care. Failure to provide adequate habilitation may well mean commitment for the life of the retarded individual. *Welsch v. Likins*, 373 F.Supp. 487, 497 (D.Minn.1974), *aff'd in part and vacated and remanded in part*, 550 F.2d 1122 (8th Cir. 1977). In fact, at Pennhurst the average residency is twenty-one years.

■ Moreover, as the Court stated in *Jackson v. Indiana*, 406 U.S. at 738, 92 S.Ct. at 1858, "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purposes for which the individual is committed." Since the only justifiable purpose

---

.(M.D.Ala.1972), *aff'd in part, rev'd in part and remanded in part sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974).

51. Dr. Birnbaum wrote:

It is proposed . . . that the courts under their traditional powers to protect the constitutional rights of our citizens begin to consider the problem of whether or not a person who has been institutionalized solely because he is sufficiently mentally ill to require institutionalization for care and treatment actually does receive adequate medical treatment so that he may regain his health, and therefore his liberty, as soon as possible; that the courts do this by means of recognizing and enforcing the right to treatment; and, that the courts do this independent of any action by any legislature, as necessary and overdue development of our present con-

cept of due process of law. 46 A.B.A.J. at 503.

*See, e. g.*: Mason & Menolascino, *supra* note 6; *Developments in the Law—Civil Commitment of the Mentally Ill*, 87 Harv.L.Rev. 1190 (1974); Herr, *Civil Rights, Uncivil Asylums and the Retarded*, 43 Cin.L.Rev. 679 (1974); Drake, *Enforcing the Right to Treatment*; *Wyatt v. Stickney*, 10 Amer.Crim.L.Rev. 587 (1972); Case Comment, *Wyatt v. Stickney and the Right of Civilly Committed Mental Patients to Adequate Treatment*, 86 Harv.L.Rev. 1282 (1973); Note, *The Wyatt Case: Implementation of a Judicial Decree Ordering Institutional Change*, 84 Yale L.J. 1338 (1975); Hoffman and Dunn, *Beyond* Rouse *and* Wyatt: *An Administrative-Law Model for Expanding and Implementing the Mental Patient's Right to Treatment*, 61 Va.L.Rev. 297 (1975).

for the commitment of the retarded is habilitation, if habilitation is not provided, the nature of the commitment bears no reasonable relation to its purpose and the individual's due process rights have been violated. *Wyatt v. Aderholt,* 503 F.2d 1305, 1312 (5th Cir. 1974); *Donaldson v. O'Connor,* 493 F.2d 507, 521 (5th Cir. 1974), *vacated,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975).[52]

■ In *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), the Supreme Court held that incarceration solely on the basis of an individual's status constitutes cruel and unusual punishment. (Robinson was convicted of being a narcotics addict.) As was pointed out in *Welsch:*

> because plaintiffs [retarded individuals] have not been guilty of any criminal offenses against society, treatment is the only constitutionally permissible purpose of their confinement, regardless of procedural protections under the governing civil commitment statute. . . . This argument rests upon the Eighth and Fourteenth Amendments, relying principally upon the Supreme Court's decision in *Robinson v. California* . . . .. The plaintiffs in the instant action are not criminals; they are victims of uncontrollable "status."

> If they are subject to "detention for mere illness—without a curative program," . . . plaintiffs will be within the ambit of the *Robinson* proscription.

373 F.Supp. at 496. Thus, commitment of the retarded can withstand constitutional scrutiny only when it is coupled with minimally adequate habilitation. *See United States v. Jackson,* 179 U.S.App.D.C. 375, 385, 553 F.2d 109, 119 (1976).

Of the federal courts which have considered the right to habilitation issue in connection with involuntarily committed retarded individuals and the right to treatment of involuntarily committed mentally or emotionally ill individuals, only two reported cases have been called to our attention which denied the existence of such a constitutional right: *Burnham v. Department of Public Health of the State of Georgia,* 349 F.Supp. 1335 (N.D.Ga.1972), and *New York State Ass'n for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752 (E.D.N.Y.1973). *Burnham* was reversed by the Fifth Circuit, 503 F.2d 1319 (5th Cir. 1974), *cert. denied,* 422 U.S. 1057, 95 S.Ct. 2680, 45 L.Ed.2d 709 (1975), and the *Rockefeller* court, in approving a consent decree in that action appeared to be questioning its earlier finding of no constitutional right to treatment:

> Somewhat different legal rubrics have been employed in [the *Donaldson, Wyatt* line of] cases—"protection from harm" in this case and "right to treatment" and "need for care" in others. It appears that there is no bright line separating these standards. In the present posture of this case, there is no need for the court

---

**52.** As heretofore pointed out, the Supreme Court's decision in *Donaldson* was very narrow; the Court did not pass upon the issue of the right to treatment or habilitation. The Court vacated the Fifth Circuit's broad holding and stated: "[o]f necessity our decision vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect, leaving this Court's opinion and judgment as the sole law of the case." 422 U.S. 563, 577 n. 12, 95 S.Ct. 2486, 2495, 45 L.Ed.2d 396 (1975). Prior to the Supreme Court's decision, the Fifth Circuit rendered a second right to treatment decision which relied heavily on its *Donaldson* opinion, *Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974), which like *Donaldson* was authored by Judge Wisdom. At least one commentator suggests "that *Wyatt* is still good law, thus leaving the right to treatment issue where it was before." *"What More"*: *A Con-*stitutional *Right to Treatment?* 22 Loyola L.Rev. 373, 383 (1976). In support of this proposition, it should be noted that four days after deciding *Donaldson,* the Supreme Court denied *certiorari* in yet another Fifth Circuit right to treatment case. *The Department of Human Resources of the State of Georgia v. Burnham,* 422 U.S. 1057, 95 S.Ct. 2680, 45 L.Ed.2d 709 (1975). In *Burnham,* the district court had found that there was no constitutional right to treatment. 349 F.Supp. 1335 (N.D.Ga.1972). The Fifth Circuit reversed on the basis of its *Donaldson* and *Aderholt* decisions. 503 F.2d 1319 (5th Cir. 1974). Even though the Supreme Court had vacated the *Donaldson* decision only four days before, it denied *certiorari* in *Burnham,* apparently allowing *Aderholt,* with its holding of a constitutional right to treatment to remain as the law of the Fifth Circuit.

to re-examine the constitutional standard properly applicable to Willowbrook's residents. The relief which the parties agreed to will advance the very rights enunciated in the case law since this court's 1973 ruling.

*New York State Ass'n for Retarded Children, Inc. v. Carey,* 393 F.Supp. 715, 719 (E.D.N.Y.1975).

The other courts which have examined the issue have all found a constitutional right to treatment or habilitation. *See, e. g., Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974); *Donaldson v. O'Connor,* 493 F.2d 507 (5th Cir. 1974), *vacated* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Gary W. v. Louisiana,* 437 F.Supp. 1209 at 1219, (E.D. La.), *modified,* October 28, 1976 (involuntarily committed retarded children have a constitutional right "to a program of treatment that affords the individual a reasonable chance to acquire and maintain those life skills that enable him to cope as effectively as his own capacities permit with the demands of his own person and of his environment and to raise the level of his physical, mental and social efficiency"); *Woe v. Mathews,* 408 F.Supp. 419, 429 (E.D.N.Y. 1976), *remanded in part, dismissed in part sub nom. Woe v. Weinberger,* 556 F.2d 563 (2d Cir. 1977) ("[a]s a tentative formulation it would seem encumbent upon the State as confiner . . . to employ whatever means are necessary, including such care and treatment as are reasonably possible in the circumstance of the case, to promote the speedy release and return to liberty of the person confined."); *Davis v. Watkins,* 384 F.Supp. 1196, 1197 (N.D.Ohio 1974) (the court, dealing with a state facility apparently serving both mentally ill and retarded individuals held that "the State, upon committing an individual 'until he regains his sanity', incurs a responsibility to provide such care as is reasonably calculated to achieve that goal."); *Saville v. Treadway,* 404 F.Supp. 430 (M.D.Tenn.1974) (three-judge court), consent agreement approved, 404 F.Supp. 433 (retarded individuals in state institutions have right to habilitative services); *Welsch v. Likins,* 373 F.Supp. 487 (D.Minn.1974), *aff'd in part and vacated and remanded in part,* 550 F.2d 1122 (8th Cir. 1977) (retarded individuals involuntarily committed to state institutions have a constitutional right to treatment).

The Third Circuit has not yet decided the right to treatment or habilitation question. However, in *Scott v. Plante,* 532 F.2d 939, 947 (1976) it reversed a district court's F.R. Civ.P. 12(b)(6) dismissal of a right to treatment claim by an involuntarily committed mentally ill patient, stating:

> The Supreme Court did not reach the issue in *O'Connor v. Donaldson, supra.* Nor has this court considered it. It is not the kind of issue, however, which we should attempt to resolve definitively on the record that is before us. . . . It suffices for present purposes to say that it does not appear to a certainty that Scott would be entitled to no relief on his right to treatment claim under any state of facts he could prove in support of that claim. Thus, a Rule 12(b)(6) dismissal was improper.[53]

We hold that when a state involuntarily commits retarded persons, it must

---

53. The constitutional right to treatment and habilitation has been extended to include other classes of involuntarily committed non-criminal offenders. *See, e. g., McRedmond v. Wilson,* 533 F.2d 757 (2d Cir. 1976) (wayward juveniles who have been institutionalized have a constitutional right to treatment); *Nelson v. Heyne,* 491 F.2d 352, 358 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974) (juveniles who were involuntarily committed— one-third for non-criminal offenses—to a correctional institution have a constitutional right to rehabilitative treatment); *Pena v. New York State Division for Youth,* 419 F.Supp. 203, 207 (S.D.N.Y.1976) ("this court finds that the detention of a youth under a juvenile justice system *absent provision for the rehabilitative treatment of such youth* is a violation of due process rights guaranteed under the Fourteenth Amendment."); *see also, Morgan v. Sproat,* 432 F.Supp. 1130, 1136 (S.D.Miss.1977); *Morales v. Turman,* 383 F.Supp. 53, 124 (E.D.Tex. 1974), *rev'd on other grounds,* 535 F.2d 864 (5th Cir. 1976), *judgment of Court of Appeals rev'd and remanded,* 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977); *Inmates of Boys' Training School v. Affleck,* 346 F.Supp. 1354, 1372 (D.R.I.1972); *Stachulak v. Coughlin,* 364 F.Supp. 686 (N.D.Ill.1973); and *Martarella v. Kelley,* 349 F.Supp. 575, 600 (S.D.N.Y.1972).

provide them with such habilitation as will afford them a reasonable opportunity to acquire and maintain those life skills necessary to cope as effectively as their capacities permit. *See Gary W. v. Louisiana,* 437 F.Supp. 1209 at 1219, (E.D.La.), *modified,* October 28, 1976. On the basis of the evidence presented in these proceedings, we find that the retarded residents of Pennhurst have not received, and are not receiving, minimally adequate habilitation. Furthermore, on the basis of this record we find that minimally adequate habilitation cannot be provided in an institution such as Pennhurst. As the Court has heretofore found, Pennhurst does not provide an atmosphere conducive to normalization which is so vital to the retarded if they are to be given the opportunity to acquire, maintain and improve their life skills. Pennhurst provides confinement and isolation, the antithesis of habilitation. We found that Pennhurst has produced regression and in many instances has destroyed life skills possessed by its retarded residents at the time of their admission.[54] We are inclined to agree with the following comments of Mason & Menolascino, *supra* note 6, at 156–7 (footnotes omitted):

> Although *Wyatt* and *Welsch* are significant in their recognition of the principles of normalization and the developmental model for the factual foundation of their formulation of the constitutional right to habilitation, their approach can be considered only the rudimentary beginning. The logic of normalization and the developmental model which *Wyatt* and *Welsch* recognized suggests full implementation of habilitation can only be achieved in a non-institutional setting. Institutions, by their very structure—a closed and segregated society founded on obsolete custodial models—can rarely normalize and habilitate the mentally retarded citizen to the extent of community programs created and modeled upon the normalization and

developmental approach components of habilitation. Neither *Wyatt* nor *Welsch* fully implemented the right to habilitation in that they failed to challenge the very existence of the institution. Consequently, the two institutional characteristics most antithetical to the application of the normalization principle remain intact: segregation from the community and the total sheltering of retarded citizens in all spheres of their lives.

■ We wish to make it clear that our finding that the retarded at Pennhurst are being deprived of their constitutional right to minimally adequate habilitation is not limited to those residents who were court committed. Nearly fifty percent of the residents at Pennhurst did not go through court commitment procedures. They have been, and are being, deprived of minimally adequate habilitation to the same extent as those who were court committed. Moreover, as we have heretofore found, voluntariness in connection with admission and exit from Pennhurst is an illusory concept. The record in this case shows that Pennhurst residents had no practical alternative at the time of their admission and at the present time, they have no place else to go.

■ No constitutional mandate has been called to our attention which would require a state to provide habilitation for its retarded citizens. However, whenever a state accepts retarded individuals into its facilities, it cannot create or maintain those facilities in a manner which deprives those individuals of the basic necessities of life. In the case of the retarded, this constitutes an obligation to provide them with minimally adequate habilitation. *See Welsch v. Likins,* 550 F.2d 1122, 1132 (8th Cir. 1977); *Nelson v. Heyne,* 491 F.2d 352, 360 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *Vanderzeil v. Hudspeth,* No. J76–262(R) at 6 (S.D.Miss., filed February 11, 1977).

---

**54.** There has been no evidence introduced that any of the plaintiffs were committed to Pennhurst because they posed a danger to society, and, thus, we are not faced with that issue in this case. Moreover, as we have heretofore pointed out, the retarded pose no danger of physical harm to society. Retarded individuals who suffer from emotional and mental problems may pose a danger to society; however, these are due to mental and emotional problems which do not come within the purview of this opinion.

Once admitted to a state facility, the residents have a constitutional right to be provided with minimally adequate habilitation under the least restrictive conditions consistent with the purpose of the commitment. *Eubanks v. Clarke,* 434 F.Supp. 1022, 1028, (E.D.Pa.1977); *J. L. v. Parham,* 412 F.Supp. 112, 139 (M.D.Ga.1976) (three-judge court), *appeal pending* 431 U.S. 936, 97 S.Ct. 2647, 53 L.Ed.2d 253 (1977); *Gary W. v. Louisiana,* 437 F.Supp. 1209, (E.D. La.), *modified,* October 28, 1976; *Woe v. Mathews,* 408 F.Supp. 419, 428 (E.D.N.Y. 1976), *remanded in part, dismissed in part sub nom. Woe v. Weinberger,* 556 F.2d 563 (2d Cir. 1977); *Suzuki v. Quisenberry,* 411 F.Supp. 1113, 1132–33 (D.Hawaii 1976); *Lynch v. Baxley,* 386 F.Supp. 378, 392 (M.D. Ala.1974); *Davis v. Watkins,* 384 F.Supp. 1196, 1206 (N.D.Ohio 1974); *Saville v. Treadway,* 404 F.Supp. 430, 437 (M.D.Tenn. 1974); *Welsch v. Likins,* 373 F.Supp. 487, 502 (D.Minn.1974), *aff'd in part and vacated and remanded in part,* 550 F.2d 1122 (8th Cir. 1977); *Morales v. Turman,* 383 F.Supp. 53, 124 (E.D.Tex.1974), *rev'd on other grounds,* 535 F.2d 864 (5th Cir. 1976), *judgment of Court of Appeals rev'd and remanded,* 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977); *Wyatt v. Stickney,* 344 F.Supp. 387 (M.D.Ala.1972), *aff'd in part, remanded in part and decision reserved in part sub nom. Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974); *Lessard v. Schmidt,* 349 F.Supp. 1078, 1096 (E.D.Wis.1972) (three-judge court), *vacated and remanded on other grounds,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); *Dixon v. Attorney*

*General of the Commonwealth of Pennsylvania,* 325 F.Supp. 966, 973–4 (M.D.Pa.1971) (consent decree), *but see Patton v. Dumpson,* 425 F.Supp. 621, 624 (S.D.N.Y.1977).[55]

The right to minimally adequate habilitation in the least restrictive alternative stems from the Supreme Court's decision in *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), in which the Court, addressing itself to the question of permissible abridgment of constitutional liberties, stated:

> even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.

All admissions to state facilities, be it through court commitment, or otherwise, entail an infringement on fundamental rights and freedoms. *See Eubanks v. Clarke,* 434 F.Supp. 1022, 1028, (E.D.Pa. 1977). Because of this, due process demands that if a state undertakes the habilitation of a retarded person, it must do so in the least restrictive setting consistent with that individual's habilitative needs. As we have heretofore pointed out, isolation and confinement are counter-productive in the habilitation of the retarded. Furthermore, since the law recognizes that habilitation other than in the least restrictive setting is a violation of one's constitutional rights,

---

**55.** The *Patton* court was troubled by the fact that in *Sanchez v. New Mexico,* 396 U.S. 276, 90 S.Ct. 588, 24 L.Ed.2d 469 (1970), the Supreme Court dismissed an appeal from a case which had rejected the least restrictive alternative for "want of a substantial federal question." For the precedential effect of a summary dismissal for want of a substantial federal question See *Mandel v. Bradley,* 432 U.S. 173, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) ("Summary actions, however . . . should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved.") Moreover, the constitutional right to treatment and habilitation is a newly developed area of the law. Nearly all of the federal cases dealing

with a constitutional right to treatment for mentally ill individuals and a constitutional right to habilitation for retarded individuals have arisen since *Sanchez. See, e. g., O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974); *Welsch v. Likins,* 373 F.Supp. 487 (D.Minn.1974), *aff'd in part and vacated and remanded in part,* 550 F.2d 1122 (8th Cir. 1977). We feel that when the Court next examines the issue, it will find that there is such a constitutional right. *See Welsch,* 373 F.Supp. at 501–2; *Lynch,* 386 F.Supp. at 392. *See also, Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv.L.Rev. 1190, 1247–8 (1974).

there is no question that Pennhurst, as an institution for the retarded, should be regarded as a monumental example of unconstitutionality with respect to the habilitation of the retarded.[56] The Commonwealth and its subdivisions have a constitutional duty to explore and provide the least stringent practicable alternatives to confinement of retarded individuals at Pennhurst. *Welsch v. Likins,* 373 F.Supp. 487, 502 (D.Minn.1974), *aff'd in part and vacated and remanded in part,* 550 F.2d 1122 (8th Cir. 1977). On the basis of this record, we find that the Commonwealth and its subdivisions did not fulfill and are not fulfilling this constitutional obligation with respect to the retarded at Pennhurst.

### B. *Constitutional Right to be Free from Harm*

The retarded at Pennhurst have been physically abused. Lack of adequate supervision has produced an atmosphere of danger to the residents. Occasionally, there have been incidents of staff abuse of residents, including rape and beatings. Hundreds of injuries, both major and minor, are reported every month.

■ Residents of state institutions for the retarded have both an Eighth and Fourteenth Amendment right to freedom from harm. *Spence v. Staras,* 507 F.2d 554, 557 (7th Cir. 1974); *Romeo v. Youngberg,* No. 76–3429 at 3 (E.D.Pa., filed June 6, 1977); *Welsch v. Likins,* 373 F.Supp. 487, 502–3 (D.Minn.1974), *aff'd in part and vacated and remanded in part,* 550 F.2d 1122 (8th Cir. 1977); *New York State Association for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752, 764 (E.D.N.Y.1973). Defendants have argued that the recent Supreme Court decision, *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), limits the applicability of the Eighth Amendment to those convicted of crimes. *Ingraham* held that the use of corporal punishment in public schools did not violate the student's Eighth Amendment rights. *Id.* 97 S.Ct. at 1409. In reaching this result, the Court reasoned:

> The schoolchild has little need for the protection of the Eighth Amendment. Though attendance may not always be voluntary, the public school remains an open institution. Except perhaps when very young, the child is not physically restrained from leaving school during school hours; and at the end of the school day, the child is invariably free to return home. Even while at school, the child brings with him the support of family and friends and is rarely apart from teachers and other pupils who may witness and protest any instances of mistreatment.
>
> The openness of the public school and its supervision by the community afford significant safeguards against the kinds of abuses from which the Eighth Amendment protects the prisoner. In virtually every community where corporal punishment is permitted in the schools, these safeguards are reinforced by the legal constraints of the common law. Public schoolteachers and administrators are privileged at common law to inflict only such corporal punishment as is reasonably necessary for the proper education and discipline of the child; any punishment going beyond the privilege may result in both civil and criminal liability. . . .
> As long as the schools are open to public scrutiny, there is no reason to believe that the common law constraints will not effectively remedy and deter excess such as those alleged in this case.

*Id.* 97 S.Ct. at 1412 (footnote omitted). The retarded at Pennhurst have none of these safeguards. Due to their own handicaps,

---

**56.** Moreover, habilitation in the least restrictive setting answers one of Chief Justice Burger's concerns, expressed in his concurrence in *Donaldson,* with respect to a constitutional right to treatment. His concern is that a state constitutionally might be able to justify indiscriminate confinement of individuals merely by providing treatment. *O'Connor v. Donaldson,* 422 U.S. 563, 589, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Since a state cannot constitutionally confine an individual in other than the least restrictive setting consistent with that individual's habilitative needs, it cannot confine a retarded person in a Pennhurst-like institution if that individual could benefit from habilitation in a less restrictive setting.

few of the retarded are in a position to aid or protect their fellow residents, or to complain about their own treatment. Pennhurst is isolated and segregated from the community. The residents are not free to leave at the end of the day. In addition, few, if any, of the physically abusive incidents at Pennhurst were committed as disciplinary measures. Furthermore, the *Ingraham* Court specifically reserved the question of the availability of the Eighth Amendment to individuals confined in "mental" institutions. *Id.* 97 S.Ct. at 1411 n. 37.

▮ As stated by Judge Judd in *New York Association for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. 752, 764–5 (E.D.N.Y.1973):

Since Willowbrook [an institution for the retarded] residents are for the most part confined behind locked gates, and are held without the possibility of a meaningful waiver of their right to freedom, they must be entitled to at least the same living conditions as prisoners. . .

One of the basic rights of a person in confinement is protection from assaults by fellow inmates or by staff. . . .

Another is the correction of conditions which violate "basic standards of human decency."

On the basis of the evidence in this record, we find that the constitutional right to be free from harm of the retarded residents at Pennhurst has been violated.

## C. Constitutional Right to Non-Discriminatory Habilitation

▮ In a three-judge decision emanating from this court, *Pennsylvania Association for Retarded Children v. Commonwealth of Pennsylvania*, 343 F.Supp. 279 (E.D.Pa.1972), it was legally recognized for the first time that the retarded had a constitutional right pursuant to the Equal Protection Clause of the Fourteenth Amendment to receive at least as much education and training as was being afforded by the Commonwealth to others.

As stated by Professor Burt in "Beyond the Right to Habilitation", in *The Mentally Retarded Citizen and the Law* 425–32 (1976):

The *PARC* theory can and should mean that any state program that segregates mentally retarded citizens as such from others is highly suspect and that courts will require states to treat mentally retarded persons indistinguishably from others, except in ways that are both very limited and very clearly beneficial to the individual. By this test, segregation of the mentally retarded in a remote large-scale institution could never pass constitutional muster . . . .

[E]xisting large-scale geographically remote institutions cannot by their nature provide adequate programs to remedy the intellectual and emotional shortcomings and the galling social stigma that led the retarded residents to these institutions. If this evidence is fully marshaled in litigation, courts can . . . rule that present patterns of state segregation of retarded persons for "habilitation" or "educational" purposes are impermissible. Courts can . . . force states to close the Partlows and Willowbrooks and, even more important, to require alternative programs for mentally retarded persons which treat them as indistinguishably as possible from other persons . . . .

A powerful case can thus be mounted that courts should command states to use extraordinary effort to avoid institutionalizing retarded citizens. By this analysis, *Wyatt* clearly was wrong in failing to address directly the adequacy of community alternatives to geographically remote residential institutional care. In this analysis, the adequacy of in-community resources is not an afterthought. It is central to the inquiry into whether separate treatment for the mentally retarded person is not inherently unequal just as racially segregated education was found inherently unequal in *Brown v. Board of Education.*

▮ In this record, the evidence has been "fully marshaled" and we find that the confinement and isolation of the retarded in the institution called Pennhurst is

segregation in a facility that clearly is separate and *not* equal. We are convinced that the same equal protection principles enunciated by the court in *Pennsylvania Association of Retarded Children v. Commonwealth of Pennsylvania*, 343 F.Supp. 279 (E.D.Pa.1972), prohibit the segregation of the retarded in an isolated institution such as Pennhurst where habilitation does not measure up to minimally adequate standards. As we have heretofore discussed in this opinion, the retarded at Pennhurst have been segregated in an institution in which they have been and are being denied minimally adequate habilitation. Thus, on the basis of this record we find that the retarded at Pennhurst have been and presently are being denied their Equal Protection Rights as guaranteed by the Fourteenth Amendment to the Constitution.

### D. Pennsylvania Statutory Right to Minimally Adequate Habilitation.

The question has also been presented to the Court as to whether the residents at Pennhurst have a statutory right to minimally adequate habilitation. 50 P.S. § 4201 provides in pertinent part:

The department [of public welfare] shall have power, and its duty shall be:

(1) To assure within the State the availability and equitable provision of adequate mental health and mental retardation services for all persons who need them . . . .

This statute was first interpreted in *In Re: Joyce Z., a minor child*, No. 2035–69 (Common Pleas, Allegheny County, filed March 31, 1975). Joyce Z.'s caseworker petitioned the court, pursuant to 50 P.S. § 4406,[57] to commit Joyce to a state facility for care and treatment. The caseworker suggested Western State School and Hospital as a proper facility for Joyce's commitment. A commitment hearing was held at which all the witnesses, including the superintendent of the institution itself, testified

that Joyce would not receive adequate treatment at Western State School and Hospital. *Id.* at 9. In fact, the Commissioner of Mental Retardation for the Department of Welfare, Western Region, testified that if Joyce were placed in the institution, the regression which she was presently experiencing would continue because she would not be able to interact with staff due to staff shortages. *Id.* at 4. In its opinion the court, in construing 50 P.S. § 4201, stated:

These are brave words. We mean to see that the State, acting through the Department of Public Welfare, abides by them.

Joyce has a right to life given to her by the Constitution of the United States; *she has a right to treatment given to her by the Mental Health and Mental Retardation Act of Pennsylvania*; this court may order that course of treatment best suited to meet Joyce's needs.

*Id.* at 10–11. (Emphasis supplied).

■■■ It is abundantly clear that the Mental Health and Mental Retardation Act, 50 P.S. §§ 4201 *et seq.*, grants to the retarded in Pennsylvania the statutory right to minimally adequate habilitation. *See Eubanks v. Clarke*, 434 F.Supp. 1022, 1027 (E.D.Pa.1977); *In Re Joyce Z.*[58] Furthermore, it is equally clear that the Commonwealth and the counties have been charged under the Act with the responsibility of providing such minimally adequate habilitation to the retarded. The Act envisions

a comprehensive cooperative State-county (or multi-county) program for the care, treatment and rehabilitation of persons who are . . . mentally retarded . . . . The State, through the Department of Welfare, is responsible for the overall supervision and control of the program to assure the availability of and equitable provision for adequate . . mental retardation facilities, and the counties, separately or in concert, are assigned responsibilities as to particular

---

57. *See supra* note 12.

58. *Cf. Janet D. v. Carros*, 240 Pa.Super. 291, 362 A.2d 1060 (1976) (Juvenile Court Act, 11

P.S. §§ 50–101 *et seq.*, provides civilly committed juveniles a right to treatment).

programs. *Hoolick v. Retreat State Hospital*, 24 Pa.Cmwlth. 218, 221–22, 354 A.2d 609, 611 (1976). *See also,* 50 P.S. § 4201(8).[59]

■ On the basis of this record, we find that both the Commonwealth and the counties have violated their statutory obligation to provide minimally adequate habilitation to the retarded residents at Pennhurst. In particular, the Commonwealth has violated its statutory mandate to supervise and control the program of minimally adequate habilitation to these individuals.

E. *Federal Statutory Right to Non-Discriminatory Habilitation*

■ The question has also been presented whether Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, grants federal statutory rights to the retarded residents at Pennhurst which have been violated. Section 504 provides:

No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

There is no question that the retarded are "handicapped individuals" within the meaning of the Act, 42 Fed.Reg. 22678; *cf. Rhode Island Society for Autistic Children v. Board of Regents for Education for the State of Rhode Island,* No. 5081 at 8 (D.R.I., filed August 1, 1975), nor is there any question that Pennhurst is a "program or activity receiving Federal financial assistance."

■ In enacting Section 504 of the Rehabilitation Act of 1973, Congress has in effect codified the constitutional right to equal protection. Section 504 was originally introduced in 1971–72 as a bill to include the handicapped in the Civil Rights Act of 1964. Introducing the bill in the Senate on January 20, 1972, Senator Humphrey, its primary sponsor there, said:

I introduce . . . a bill . . . to insure equal opportunities for the handicapped by prohibiting needless discrimination in programs receiving Federal financial assistance . . . .. The time has come when we can no longer tolerate the invisibility of the handicapped in America . . . .. I am calling for public attention to three-fourths of the Nation's institutionalized mentally retarded, who live in public and private residential facilities which are more than 50 years old, functionally inadequate, and designed simply to isolate these persons from society . . . .. These people have the right to live, to work to the best of their ability—to know the dignity to which every human being is entitled. But too often we keep children, whom we regard as "different" or a "disturbing influence" out of our schools and community activities altogether . . . .. Where is the cost-effectiveness in consigning them to . . . "terminal" care in an institution?

These are people who can and must be helped to help themselves. That this is their constitutional right is clearly affirmed in a number of recent decisions in various judicial jurisdictions.

118 Cong. Rec. 525 (1972).

In view of our finding that the Equal Protection Clause of the Fourteenth Amendment prohibits the segregation of the retarded in an isolated institution such as Pennhurst where the habilitation provided the retarded does not meet minimally adequate standards, consistency requires that we find that the Pennhurst residents' federal statutory right to habilitation in a nondiscriminatory manner has been violated. *See Nattie T. v. Charles E. Holladay,* No. DC 75–31–S (N.D.Miss., filed July 20, 1977). We hold that Section 504 confers a private right of action; that it imposes affirmative obligations on state and local governmental officials and that under Section 504 unnecessarily separate and minimally inadequate

---

**59.** The counties also have the power to establish "[a]ny other service or program designed to prevent . . . the necessity of admitting or committing the mentally disabled to a facility." 50 P.S. § 4301(e)(3).

**1324**

services are discriminatory and unlawful. *Lloyd v. Regional Transportation Authority*, 548 F.2d 1277 (7th Cir. 1977); *Barnes v. Converse College*, 436 F.Supp. 635 (D.S.C., filed July 12, 1977); *Gurmankin v. Costanzo*, 411 F.Supp. 982 (E.D.Pa.1976) *aff'd*, 556 F.2d 184 (3d Cir. 1977); 42 Fed.Reg. 22687 (1977); *cf. Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). On the basis of this record, we find that the rights of the retarded at Pennhurst under Section 504 of the Rehabilitation Act of 1973 have been and are being violated.

## V. Liability of the Individual Defendants

Plaintiffs Terri Lee Halderman, Larry Taylor, Kenny Taylor, Robert Sobetsky, Theresa Sobetsky, Nancy Beth Bowman, George Sorotos, and Linda Taub [60] are retarded individuals who resided at Pennhurst. They seek monetary damages for injuries received while at the institution from the following defendants: Frank S. Beal (Secretary of the Pennsylvania Department of Public Welfare); Stanley Meyers (Deputy Secretary for Mental Retardation, Pennsylvania Department of Public Welfare); Helen Wohlgemuth (former Secretary of the Pennsylvania Department of Public Welfare); Aldo Colautti (Executive Deputy Secretary, Pennsylvania Department of Public Welfare); Wilbur Hobbs (Deputy Secretary for Southeastern Region, Pennsylvania Department of Public Welfare); Russell Rice, Jr. (Commissioner of Mental Retardation for Southeastern Region, Pennsylvania Department of Public Welfare); C. Duane Youngberg (Superintendent of Pennhurst); Robert Smilovitz (former Assistant Superintendent of Pennsylvania); Joseph Foster (Assistant Superintendent of Pennhurst); Margaret Green (employee at Pennhurst); Betty Uphold (a supervisor on Unit 9 at Pennhurst); Alice Barton (a supervisor on Unit 7 at Pennhurst); P. E. (Pauline) Klick (charge aid on Unit 7 at Pennhurst); Dr. Parocca (a former Pennhurst physician) and Helen Francis (Director of Nursing at Pennhurst).

As the Court heretofore found, these plaintiffs did suffer serious injury during their residence at Pennhurst. However, there was no evidence introduced at trial that any one of the above named defendants was, in any way, personally involved with the physical abuses inflicted upon these residents. To the contrary, the evidence shows that the defendants acted in the utmost good faith and that they did not know nor reasonably should have known that the actions which they took, or failed to take, within the sphere of their official responsibilities were in any way violative of the rights of the retarded residents at Pennhurst. For the most part, the evidence showed that those affiliated with the administration of Pennhurst were dedicated and sincere in their efforts to habilitate the retarded who came within the sphere of their supervision. They apparently took every means available to them to reduce the incidents of abuse and injury, but were constantly faced with staff shortages. In addition, as we have already found, the administration at Pennhurst was saddled with an institution which by its very nature produced an atmosphere conducive to injury. The Court, therefore, finds that the defendants have met their burden of convincing us by a preponderance of the evidence that they are entitled to the good faith immunity from damages afforded to such officials in connection with the injuries suffered by the named plaintiffs. *O'Connor v. Donaldson*, 422 U.S. 563, 576–77, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Thompson v. Burke*, 556 F.2d 231, 239–40 (3d Cir. 1977); *Skehan v. Board of Trustees of Bloomsburg State College*, 538 F.2d 53, 59–62 (3d Cir. 1976). We find that the individual defendants are dedicated professionals in the field of retardation who were given very little with which to accomplish the habilitation of the retarded at Pennhurst.

Accordingly, we find that there is no basis for awarding monetary damages in this case.

---

**60.** Mr. Taub testified that neither he nor his daughter, Linda, seek monetary damages despite the allegation in the complaint to the contrary.

## VI. *Conclusion*

This opinion is in lieu of Findings of Fact and Conclusions of Law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. As we have attempted to make clear, our Findings and Conclusions pertain solely to the retarded at Pennhurst.

For the reasons heretofore enunciated, the Court finds that the retarded at Pennhurst have been and are presently being denied certain constitutional and statutory rights in connection with their institutionalization at Pennhurst.

In an Order filed this date, we have scheduled a hearing for Friday, January 6, 1978 at 9:00 a. m. in Courtroom 10–B of this United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania for the purpose of determining the appropriate relief to be granted.

## ON INJUNCTIVE RELIEF

In an opinion filed on December 23, 1977, this Court made findings of fact and conclusions of law in this matter. Upon its findings, the Court held that the constitutional and statutory rights of the retarded at Pennhurst State School and Hospital ("Pennhurst") had been and are being violated. Some of the determinations made by the Court in its opinion were:

■ 1. That when a state institutionalizes individuals because they are retarded, the United States Constitution (Eighth and Fourteenth Amendments) and the laws of Pennsylvania (50 P.S. §§ 4101 *et seq.*) require the state to provide such minimally adequate habilitation as will afford a reasonable opportunity for them to acquire and maintain such life skills as are necessary to enable them to cope as effectively as their capacities permit.

■ 2. That the Rehabilitation Act of 1973, 29 U.S.C. § 794, grants rights to the retarded residents of Pennhurst, which rights have been and are being violated.

■ 3. That the retarded at Pennhurst are not receiving minimally adequate habilitation and that such minimally adequate habilitation cannot be provided at Pennhurst because it does not provide an atmosphere conducive to normalization, which the experts all agree is vital to the minimally adequate habilitation of the retarded.

Having concluded the liability phase of this litigation, we must now determine the appropriate relief. In view of the Court's finding that institutionalization at Pennhurst is not conducive to normalization, which is vital to the habilitation of the retarded, our Order must provide that immediate steps be taken to remove the retarded residents from Pennhurst. Great caution and care must be exercised, however, to make certain that each and every retarded resident who is moved from Pennhurst can be accommodated in a community facility which will provide minimally adequate habilitation. Furthermore, the Court's Order shall not be construed to limit in any manner the use of the Pennhurst facilities from any other purpose in the future.

A hearing was held on January 6, 1978, at which the Court requested that the parties meet and attempt to agree upon a Court Order which would be acceptable to all the litigants. After meeting, the parties informed the Court that they had been unable to agree and would never be able to agree. The Court then directed that the parties submit proposed Orders detailing their views as to the appropriate relief for the Court to grant together with a memorandum pointing out what they considered unacceptable in their opponent's proposed Order.

The Order submitted by the Commonwealth defendants contained a plan which was essentially the same plan introduced by them at the trial in May, 1977. As was pointed out in this Court's opinion, the Commonwealth defendants agreed that the retarded should be removed from Pennhurst and readily admitted that the only reason that the litigation was necessary was because they wished to accomplish the closing of Pennhurst as a residence for the retarded, pursuant to their own schedule which was vague and indefinite.

A final hearing was held on January 16, 1978, at which time the parties informed the Court that they did not intend to introduce any additional evidence. All the parties agreed that the record in this case contained all the evidence necessary for the Court to formulate its Order.

Accordingly, we shall this date enter an Order of judgment in favor of the plaintiffs and against the defendants, and shall mandate the appropriate injunctive relief necessary to remedy the constitutional and statutory violations which the Court in its Opinion of December 23, 1977 found are being suffered by the retarded residents at Pennhurst.

## ORDER

AND NOW, this 17th day of March, 1978, pursuant to findings of fact and conclusions of law made by the Court in an Opinion filed December 23, 1977, it is hereby ORDERED that judgment is entered in favor of the plaintiffs and against the defendants, and injunctive relief is ORDERED as follows:

1. Commonwealth and county defendants, their successors, and their officers, agents, servants, employees, attorneys and all persons in active concert or participation with them are permanently enjoined to provide suitable community living arrangements for the retarded residents of Pennhurst, and those retarded persons on its waiting list, together with such community services as are necessary to provide them with minimally adequate habilitation until such time as the retarded individual is no longer in need of such living arrangement and/or community service.

2. Commonwealth and county defendants, as aforesaid, are permanently enjoined to develop and to provide a written individualized program plan, formulated in accordance with professional standards (Opinion, page 25; Roos N.T. 1–115, 1–116, Hare N.T. 8–168) to each member of plaintiff class, to provide to each an individualized habilitation program, to provide annual periodic review thereof and the opportunity to each member of plaintiff class and to his or her next friend to be heard thereon.

3. Commonwealth and county defendants, as aforesaid, are permanently enjoined to provide all necessary and proper monitoring mechanisms to assure that community living arrangements and other community services of the necessary quantity and quality are provided and maintained.

4. Commonwealth and county defendants, as aforesaid, are permanently enjoined to implement with dispatch Act 256 of the 1970 Pennsylvania General Assembly, the specific schedule to be set by further Order of this Court upon recommendation of the Master as set forth in paragraph 6(a) below.

5. The Court, on the basis of nine weeks' testimony in this case and the submissions of all parties, finds that the implementation of this Order will be impossible without the appointment of a Special Master, and, therefore, pursuant to Rule 53, Fed.R. Civ.P., and in the exercise of the Court's equitable powers, the Court shall appoint a Special Master with the power and duty to plan, organize, direct, supervise and monitor the implementation of this and any further Orders of the Court. Commonwealth and county defendants, their successors, officers, agents, servants, employees, attorneys and all persons in active concert or participation with them shall provide the Master with access to all premises, records, documents and personnel and residents and with every other cooperation and service necessary to the discharge of the Master's duties and shall make available to the Master all professional and other resources of the Department of Public Welfare, the Pennhurst State School and Hospital, the County Offices of Mental Retardation and the Base Service Units as may be necessary to execute this Court's Orders.

6. The Special Master shall prepare and present to this Court for its approval and Order a Plan of Implementation which shall include the following:

(a) A plan specifying the quantity and type of community living arrangements and other community services necessary for the habilitation of all plaintiffs in the

least separate, most integrated, least restrictive community setting, taking into account the existing community services in the five county area and including, by county, specification of the residential, program and staffing patterns necessary, the delineation of responsibility for their creation and maintenance, their funding and a specified time frame for their provision.

(b) A report specifying resources, procedures, and a schedule for individual evaluations and the formulation of individual exit and community program plans required for the habilitation of each member of plaintiff class and for their periodic review.

(c) A plan for the recruitment, hiring and training of a sufficient number of qualified community staff to be detailed to each Base Service Unit to manage the preparation of individual exit and community program plans for each member of plaintiff class and upon completion of such plans to assist in the execution of the responsibility to create, develop, maintain, and monitor the community living arrangements and other services required.

(d) A plan for the creation, development and maintenance of mechanisms to monitor a system of community services to assure that community living arrangements and other community services of the necessary quality and quantity are continuously provided to retarded persons in the least separate, most integrated, least restrictive community setting, which plan shall include but shall not be limited to the provision of friend-advocates to assist in the protection of the rights of each member of plaintiff class.

(e) A plan to provide retarded people, members of the class, with continuing information concerning the effect and the implementation of the Court's decision, concerning the plans to provide all necessary community living arrangements and other community services to them and any other general or specific information regarding the conditions necessary to habilitation of retarded persons and to provide for consultation with them.

(f) A plan to provide parents and family of the members of the class with continuing information concerning the effect and the implementation of the Court's decision, concerning the plans to provide all necessary community living arrangements and other community services to their relative and any other general or specific information regarding the conditions necessary to habilitation of retarded persons and to provide for consultation with them.

(g) A plan to provide opportunities for alternative employment to each employee of Pennhurst State School and Hospital, including employment in community programs and otherwise.

7. Within not more than sixty (60) days after appointment, the Master shall file with this Court the reports required at paragraphs 6(a) and (b) above and 11 below. A hearing will then be scheduled by the Court within fifteen (15) days from the date of their filing. Following the adoption of any plan by Order of the Court, it shall be implemented forthwith.

8. The Master shall engage such staff of his or her own as he or she finds necessary, subject to the approval of the Court. The Master and his or her staff shall be compensated by commonwealth defendants at a rate to be set by the Court; the expenses of the mastership shall be borne by the commonwealth defendants. The Master shall promptly submit to the Court a form of Order with respect to these matters.

9. County defendants, as aforesaid, are hereby enjoined from recommending or in any way counselling that any individual be committed to Pennhurst, and from petitioning for the commitment of any individual to Pennhurst, and from advancing in any way any application for admission to Pennhurst, and are herewith enjoined from participating in any program or activity in connection with the placement in the future or commitment in the future of any retarded person at Pennhurst.

10. Commonwealth defendants, as aforesaid, are hereby enjoined from recom-

mending or in any way counselling that any individual be committed to Pennhurst, and from petitioning for the commitment of any individual to Pennhurst, and from advancing in any way any application for admission to Pennhurst, and are herewith enjoined from participating in any program or activity in connection with the placement in the future or commitment in the future of any retarded person at Pennhurst. Commonwealth defendants are further enjoined from providing a residence and/or habilitation at Pennhurst to any retarded person who is not as of this date a resident at Pennhurst.

11. The Special Master, as aforesaid, shall prepare and present to the Court for its Order a plan for the interim operation of Pennhurst pending its prompt replacement by community living arrangements and other community services. The plan shall address, but need not be limited to, the matters referenced in paragraphs 12–19 below, any other condition at Pennhurst which threatens the life, safety or well-being of any Pennhurst resident, and measures to assure that the interim operation of Pennhurst, including all activities therein, contributes to the prompt provision of services in the community necessary to the habilitation of each Pennhurst resident.

12. Commonwealth defendants are hereby mandated to take every precaution to prevent the physical or psychological abuse, neglect or mistreatment of any Pennhurst resident. Each and every alleged incident of abuse, neglect or mistreatment shall be promptly investigated. The manner and mechanisms of such investigations shall be developed and established by the plan referenced in paragraph 11.

13. Commonwealth defendants are hereby enjoined to exert the maximum effort in enforcing the following Department of Public Welfare regulations on the "Use of Restraints in Treating Patients/Residents" and "Personnel Rules and Institutional Policy on Acts of Abuse Against Patients/Residents" (promulgated in 7 Pennsylvania Bulletin 3199 (October 29, 1977)) which include *inter alia* the following requirements:

a. That mechanical restraints controlling involuntary movement or lack of muscular control due to organic conditions be employed only as part of an individual program plan, upon a finding of the program team trained in the use of such restraints, and only when necessary to 1) prevent injury to self or others, or 2) promote normative body positioning and physical functioning.

b. That restraints shall be used to control acute or episodic, aggressive behavior only when a resident is acting in such a manner as to be a clear and present danger to self or others and only when less restrictive measures and techniques have been proven to be less effective.

c. That mechanical restraints may be used only upon the order of a qualified mental retardation professional for a period not to exceed two hours; that the resident must be checked every fifteen minutes and must be examined by a physician before the initial order is renewed.

d. That chemical restraints may be administered only upon the order of a physician.

e. That seclusion (practice of placing a resident alone in a locked room) is prohibited in all cases except where it is apparent that there exists a clear and present danger to the resident, other residents or staff and all other less restrictive methods have failed or have been deemed inappropriate. (Title XIX—ICF–MR 249.-13 and State Agency Letter No. 77–30 issued December 14, 1977.)

f. That individual program plans shall require and document that all possible attempts be made at preventing assaultive behavior by positive, constructive intervention.

g. That acts of abuse by employees directed at residents are absolutely prohibited and are cause for disciplinary action including dismissal.

h. That an abusive act is any action which may cause or causes physical or emotional harm or injury and includes any willful action which violates the regulations on use of restraints.

14. Commonwealth defendants are hereby enjoined from:

(a) Administering excessive or unnecessary medications to class members;

(b) Using medication as punishment, for the convenience of the staff, as a substitute for programming, or in quantities that interfere with a Pennhurst resident's functioning;

(c) Failing to ensure that only appropriately trained staff are allowed to administer drugs to residents;

(d) Failing to provide training programs to staff who administer drugs to residents. The nature of such training programs, and the qualifications to be required of staff members who administer drugs to residents shall be established in the plan;

(e) Administering drugs to residents on a p. r. n. basis. Written policies and procedures governing the safe administration and handling of medications shall be established pursuant to guidelines developed in the plan;

(f) Failing to monitor and to provide for at least monthly reviews by a physician of each resident's medications.

15. Commonwealth defendants are enjoined from failing to provide a program of medical and health related services for residents which provides accessibility, quality and continuity of care for physical illness or injury. The plan of implementation shall develop and establish detailed standards for the provision of adequate medical and health related services to residents.

16. Commonwealth defendants are hereby enjoined from failing to provide individualized adaptive wheelchairs to each physically handicapped resident who needs them. Each and every individual resident shall be immediately evaluated to ascertain the need for such equipment.

17. Commonwealth defendants are hereby enjoined from feeding any resident in the supine position or in any position less than the maximum upright position consistent with their capabilities and handicaps.

18. Commonwealth defendants are hereby enjoined from denying any resident programmed activities as punishment.

19. Commonwealth defendants are enjoined to take every precaution to keep every Pennhurst building currently housing residents clean, odorless and insect-free at all times.

20. All bulletins, memoranda, directives of official policy issued by the defendants in connection with the implementation of this Court's Order, shall, upon issuance, be sent to counsel for each of the plaintiffs.

21. Jurisdiction is retained by this Court until further Order.