**Terri Lee HALDERMAN et al., Plaintiffs,**

**Pennsylvania Association for Retarded Citizens et al., Plaintiffs-Intervenors,**

**United States of America, Plaintiff-Intervenor,**

v.

**PENNHURST STATE SCHOOL AND HOSPITAL et al., Defendants.**

Civ. A. No. 74–1345.

United States District Court, E. D. Pennsylvania.

May 9, 1978.

David Ferleger, Philadelphia, Pa., for plaintiffs.

The Public Interest Law Center of Philadelphia by Thomas K. Gilhool, Chief Counsel, Frank J. Laski and Edward A. Stutman, Philadelphia, Pa., for plaintiff-intervenors, Pennsylvania Assn. for Retarded Citizens (Moskowitz, Hight, Preusch, and DiNolfi).

Peter A. Glascott, James M. McNamara, Asst. City Sol., Doylestown, Pa., for County of Bucks, George Metzer, Roger Bowers, Joseph Catania and Peter Bodenheimer.

David W. Marston, U. S. Atty., Philadelphia, Pa., J. Stanley Pottinger, Asst. Atty. Gen., Civ. Rights Div., U. S. Dept. of Justice, Arthur E. Peabody, Jr., Washington, D. C., for U. S.

Frank, Margolis, Edelstein & Scherlis, Joseph Goldberg, Philadelphia, Pa., for Margaret Green, Betty Uphold, Alice Barton, P. E. Klick, Dr. Parocca and Helen Francis.

Thomas M. Kittredge, Philadelphia, Pa., Patricia H. Jenkins, Media, Pa., for Faith Whittlesey, Char. Keeler, Wm. Spingle, Comm. of Delaware County, P. P. Burrichter-Delaware County.

Thomas F. Schilpp, Luchsinger, Schilpp, Murphy & Noel, Media, Pa., for Commissioners of County of Delaware and Paul Burrichter, Administrator.

Thomas M. Kittredge, Morgan, Lewis & Bockius, Philadelphia, Pa., for Robert Strebl, Earl Baker, Leo McDermott and William McKendry.

Paul Sacks, Asst. City Sol., Philadelphia, Pa., for Mayor Frank L. Rizzo, City Counsel of Philadelphia, and Leon Soffer.

Roger B. Reynolds, Montgomery County Sol., Ward A. Cotton, Sol., Montgomery, Joseph A. Smyth, Asst. Montgomery County Sol., Norristown, Pa., for A. Russell Parkhouse, Frank W. Jenkins, Lawrence H. Curry, Montgomery County Comm., and Hermann A. Roether.

Norman Watkins, Jeffrey Cooper, Deputy Attys. Gen., Dept. of Justice, Harrisburg, Pa., for Pennhurst State School & Hospital, Dept. of Public Welfare, Frank S. Beal, Stanley Meyers, Aldo Colautti, Wilbur Hobbs, Russell Rice, Jr., and C. Duane Youngberg.

MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

In an opinion filed on December 23, 1977, 446 F.Supp. 1295, this Court held that the constitutional and statutory rights of the retarded at Pennhurst State School and Hospital ("Pennhurst") had been and are being violated. As set forth in our memorandum of March 17, 1978, which accompanied the Court's Order in this case, some of the determinations made by the Court in its opinion were:

1. That when a state institutionalizes individuals because they are retarded, the United States Constitution (Eighth and Fourteenth Amendments) and the laws of Pennsylvania (50 P.S. §§ 4101 et seq.) require the state to provide such minimally adequate habilitation as will afford a reasonable opportunity for them to acquire and maintain such life skills as are necessary to enable them to cope as effectively as their capacities permit.

2. That the Rehabilitation Act of 1973, 29 U.S.C. § 794, grants rights to the retarded residents of Pennhurst, which rights have been and are being violated.

3. That the retarded at Pennhurst are not receiving minimally adequate habilitation and that such minimally adequate habilitation cannot be provided at Pennhurst because it does not provide an atmosphere conducive to normalization, which all the experts agree is vital to the minimally adequate habilitation of the retarded.

Based upon these and other determinations, this Court ordered appropriate injunctive relief. Commonwealth defendants and Bucks, Chester, Delaware, Montgomery and Philadelphia Counties have filed notices of appeal from the Court's judgment. The Commonwealth now seeks a stay of the judgment order pending a determination of its appeal by the Third Circuit.

On April 13, 1978, a hearing was held in connection with the Commonwealth's motion to stay the judgment and, for the reasons hereinafter set forth, the motion will be denied.

Fed.R.Civ.P. 62(c) provides in pertinent part that:

When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

It is well settled by the case law that a party seeking the stay of a judgment order must show (1) that it will likely prevail on the merits of the appeal, (2) that it will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay. *Philadelphia Counsel of Neighborhood Organizations v. Adams*, 451 F.Supp. 114 (E.D.Pa.1978); *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970); *Resident Advisory Board v. Rizzo*, 429 F.Supp. 222, 224 (E.D.Pa.1977). A motion requesting a stay of a judgment order is addressed to the discretion of the court. The Third Circuit has recently stated that in considering the four-prong test enumerated above, the district court should realize that

these [four] factors structure the inquiry, however, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a "delicate balancing" of all elements.

*Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815, (3d Cir. 1978). *See, Evans v. Buchanan*, 424 F.Supp. 875, 879 (D.Del.1976).

1. *Likelihood of Success on Appeal*[1]

Commonwealth defendants contend that "[t]his Court's decision and order are novel

---

1. There is disagreement among the circuits as to the degree of likelihood of success which must be shown. *See Resident Advisory Board v. Rizzo*, 429 F.Supp. 222, 224 n.1 (E.D.Pa. 1977). We do not herein make any determination as to the degree of certainty which must

and precedent setting, both in the rights enunciated and the scope of relief granted. . . . The novelty of the decision and order above is itself more than sufficient reason to grant a stay." However, as we have heretofore pointed out, the Court's judgment was based on several alternate legal theories, any one of which is sufficient to sustain the judgment. Several of these theories have been accepted by the courts which have considered them. See discussion of these cases in *Halderman v. Pennhurst,* 446 F.Supp. 1295, 1316–17, 1319 (E.D.Pa.1977).

### 2. *Irreparable Injury to Commonwealth Defendants*

The Commonwealth contends that failure to stay the Court's Order of March 17, 1978 will cause irreparable injury in that compliance will require the expenditure of vast sums of money. In view of the testimony given by Commonwealth witnesses at trial that the Commonwealth intended to move all the retarded residents from Pennhurst into community facilities, the Commonwealth's contention that the Court's Order requiring this to be done will cause irreparable injury is unpersuasive. As the Court found in its opinion of December 23, 1977:

> Having concluded the trial phase of the liability portion of this litigation, it has become apparent that by and large the parties share the same goals: all desire to improve the education, training and care provided the retarded in Pennsylvania and believe that Pennhurst should be closed and that all residents should be educated, trained and cared for in the community. All agree that institutions such as Pennhurst are inappropriate and inadequate for the habilitation of the retarded. Defendants agree with plaintiffs' contention that the habilitation provided Pennhurst residents does not meet minimally acceptable professional standards. The Commonwealth in recent years has been attempting to upgrade Pennhurst and the education, training

and care provided therein to its retarded residents. Moreover, the Pennsylvania Department of Public Welfare's current plans call for the transfer of all Pennhurst residents from the institution into the community (though perhaps temporarily into other institutions) by the early 1980's.

*Halderman v. Pennhurst,* 446 F.Supp. at 1313.

The Commonwealth's irreparable injury argument becomes even less persuasive when one considers that in 1970, Act 256 was signed by the Governor of Pennsylvania. This Act appropriated $21,000,000 for the purpose of planning, designing and constructing community facilities which would enable 900 Pennhurst residents to be transferred to the community. As the record in this case shows, although seven and one-half years have gone by, few Pennhurst residents have been moved into community facilities pursuant to the legislation. Over $18,000,000 remains unspent. *Halderman v. Pennhurst,* 446 F.Supp. at 1311–1312.

The argument that the cost of compliance with the Court's Order will bring irreparable injury to the Commonwealth loses all credibility in light of the Court's finding that providing habilitative services for the retarded in the community is less expensive than operating a large isolated institution such as Pennhurst. As the Court found in its opinion of December 23, 1977:

> Comparable facilities in the community are generally less expensive than large isolated state institutions. Services can be purchased at regular rates, rather than at rates which must be paid to attract individuals to work in a setting like Pennhurst. The cost of running Pennhurst in 1976 was $27.8 million dollars, or $60 per resident per day. This does not include the fair rental value of the buildings at Pennhurst (estimated at $3–$4 per resident per day). The statewide cost of community living arrangements in Pennsylvania for 1976 was $17.64 per individual per day. Program services, which ⅓ of mentally retarded individuals would need,

---

be shown, since we find that the Commonwealth has not satisfied even the least rigorous

of the standards, *i. e.,* mere likelihood of success on appeal.

average approximately $10 per individual per day. Moreover, keeping the retarded individual in the community makes it possible for him or her to get employment. Eighty-five percent of the mentally retarded can be employed, though not all are capable of competitive employment. The lifetime earnings of a mildly retarded individual often exceeds $500,000. For those with an I. Q. between 25 and 50, 45% of men and 12% of women earn about 20% of the average wage. When the retarded can work, the amount of financial support which society must provide decreases and the individuals may benefit society with the taxes they pay. Furthermore, the investment per individual at Pennhurst is primarily for warehousing and not for the individual's well-being or future planning, as is the case with community facilities.

*Halderman v. Pennhurst,* 446 F.Supp. at 1312 (citations omitted).

The Commonwealth also contends that it will lose federal financial assistance if the Court's Order is not stayed. Throughout the trial, the Commonwealth stressed the fact that retarded individuals residing in community living arrangements were not eligible for federal medical assistance funds (Title XIX) while those residing in Pennhurst were. However, in regulations published March 10, 1978, effective *October 1, 1976,* Title XIX funds became available to the eligible retarded living in public community residences housing no more than 16 persons. 42 C.F.R. § 448.60, 43 Fed.Reg. 9810, 9816 (March 10, 1978). Moreover, the eligible retarded can now receive supplemental security income (SSI) benefits. 20 C.F.R. § 416.231(a)(4), 43 Fed.Reg. 4004, 4006 (January 31, 1978). Additionally, it appears that federal loans are now available for the construction of community facilities for the retarded pursuant to section 202 of the Housing Act of 1959, as amended, 12 U.S.C. § 1701q. 24 C.F.R. § 885, 43 Fed.Reg. 8492 (March 1, 1978).

The Court's judgment and order assures that the Commonwealth's own goals for the retarded are implemented and its contention that a failure to stay the judgment will bring irreparable injury is without merit.

### 3. *Injury to Plaintiffs from a Stay*

As the Court's opinion of December 23, 1977 demonstrates, the retarded residents of Pennhurst have endured severe and widespread deprivations of their constitutional and statutory rights—deprivations which continue to this day. The Court's Order of March 17, 1978 was designed to alleviate these deprivations. Delay in implementing that Order would result in further irreparable injury to the plaintiffs.

### 4. *Public Interest*

Commonwealth defendants contend that the public interest would benefit from a stay. We do not agree. The public interest will never benefit from a failure to provide minimally adequate habilitation to its retarded citizens. This Court's Order represents nothing more than a judicial recognition that the retarded have constitutional and statutory rights which must not be denied.

Having carefully considered all the contentions of the Commonwealth and having balanced the equities, we shall enter an Order denying the Commonwealth's motion requesting a stay of this Court's Order of March 17, 1978.