## In re Schmidt

Before Zavarella, *A.J.*, Ross and McKenna, *JJ.*

*Dennis Biondo,* for petitioner.
*Timothy Finnery,* for respondent.
*Marlene W. Jackson,* for Commonwealth.

ROSS, E., *J.*, February 13, 1979—This matter is before the court after argument on exceptions of the

County of Allegheny Mental Health and Mental Retardation Program to an order of court entered December 12, 1977, wherein, after hearing, the Honorable William S. Rahauser committed respondent Joseph Schmidt under section 406 of the Mental Health and Mental Retardation Act of October 20, 1966, P.L. 96, art. IV, 50 P.S. §4406, to Western Center, a State institution, for a period not to exceed six months, ordered the Allegheny County office of Mental Health and Mental Retardation within 30 days, in cooperation with the Department of Public Welfare of the Commonwealth of Pennsylvania, to develop a practical life management plan for Joseph Schmidt, and further ordered the Allegheny County Office of Mental Health and Mental Retardation to take whatever steps were in good faith necessary to develop, locate or provide respondent with a placement appropriate for his needs, the same to be done within six months of the order.

It is to this order that the County of Allegheny Mental Health and Mental Retardation Program filed exceptions alleging respondent had been properly admitted to a State facility for the care of the retarded, and that the order extended beyond the confines of the Mental Health and Mental Retardation Act of 1966, supra, sec. 406, 50 P.S. §4406.

It is without question that Joseph Schmidt is a retarded male who at the time of the hearing was 22 years old. It is undisputed that Joseph needs constant supervision. He is unable to distinguish between edible and inedible objects. He is able to walk but is not totally toilet-trained. He is a large, husky male with extensive physical energy that at times leaves him uncontrollable and difficult even for those who supervise him.

From the time Joseph was eight years old he lived in a placement at Allegheny Valley School, a privately operated, residential school for mentally retarded children. Allegheny Valley School is under contract with the county to provide interim care for mentally retarded persons who have been removed from their homes. Because the staff at Allegheny Valley School was not sufficient in number to provide the supervision required by Joseph, the county petitioned this court under section 406 of the Mental Health and Mental Retardation Act of 1966, supra, 50 P.S. §4406, to have Joseph committed to Western Center. Western Center is a State institution. The testimony reflects that if placed at Western Center, Joseph would be in a setting that provided only a 1 to 14 staff-patient ratio. At Allegheny Valley School, Joseph was in a 1 to 7 staff-patient ratio, and this admittedly was not sufficient. Robert Beyer, a psychologist from Western Center, testified from his review of the records that Joseph had A.D.L., toilet training and dressing skill deficiencies and a major language problem. He indicated that such deficiencies are probably not reversible but that training in such areas is essential to reduce Joseph's dependency on staff. In order to receive the training he needs to reduce such dependency, Joseph must be in a setting that has a maximum 1 to 3 staff-patient ratio.

Larry Jenkins, acting Commissioner of Mental Retardation for the Western Region, Department of Public Welfare, testified that facilities for persons like Joseph exist in the Commonwealth. At the hearing there was some question whether or not vacancies existed in any of those facilities.

After hearing, the court, since it had no alternative placement for Joseph, issued an order commit-

ting him to Western Center for a period of six months. During that period of time the county was ordered to locate, develop or provide Joseph with a placement appropriate for his needs.

Although not specifically stated, the order implies that Western Center was *not* the appropriate placement. This court en banc agrees. In recent years various courts have been faced with constitutional questions regarding the deprivation of due process suffered by institutionalization where such may not be appropriate. At one time, communities utilized the institution as the panacea for the "problem" of citizens who were unable to care for themselves. The right to treatment for the individual was undeveloped, as was the right to have as little treatment as possible. Finally, through litigation and legislative enactment, this Commonwealth and many other states of the union adopted standards that encompassed least restrictive alternatives so as to ensure that the rights of those the community sought to institutionalize would not be abridged.

In Goldy v. Beal, 429 F. Supp. 640, 648 (1976), the United States District Court for the Middle District of Pennsylvania declared section 406 of the Mental Health and Mental Retardation Act of 1966, supra, 50 P.S. §4406, to be unconstitutional and issued a stay order outlining with specificity mandated procedures to be utilized for commitments of "mentally ill" persons. In conformity with the standards initiated by the court, the Department of Welfare issued regulations governing commitments of mentally retarded persons. These regulations in part provide:

"'1. On July 28, 1976, this Court declared unconstitutional and enjoined the operation of Section

406 of the Mental Health and Mental Retardation Act of 1966.

"'2. Legislation has been introduced in the Pennsylvania General Assembly which would provide commitment procedures for the mentally retarded.

"'3. Until such legislation is enacted, *no* procedures exist for the involuntary commitment of a mentally retarded adult to an institution for the mentally retarded for long term non-emergency care and treatment which is deemed necessary.

"'4. Until this type of legislation is enacted and becomes effective, commitments of mentally retarded adults pursuant to Section 406 may be processed provided that Defendant Beal, his agents and assigns, those under his direction, and all facility directors *shall not receive any such person* except upon judicial determination that the following standard is met.

"'A person shall be determined *to* be a mentally retarded person in need of residential placement only upon the following findings . . . (3) the person, because of his retardation presents a substantial risk of physical injury to himself or physical debilitation as demonstrated by behavior within 30 days of the petition which shows that he is unable to provide for, and is not providing for his most basic need for nourishment, personal and medical care, shelter, self-protection and safety, that provision for such needs is *not available* and *cannot be developed* or provided in his own home or in *his own community* without residential placement.'"

These standards of least restrictive alternatives were consistent not only with the Goldy case, but with an emerging trend in other jurisdictions where the right to due process has been protected and preserved. See also Lessard v. Schmidt, 349 F.

Supp. 1078, 1096 (U.S.D.C. E.D. Wisc. 1972); Wyatt v. Stickney, 344 F. Supp. 373, 378 (U.S.D.C. M.D. Alabama, N.D. 1972); New York Association for Retarded Children v. Rockefeller, 357 F. Supp. 752, 764 (U.S.D.C. E.D. N.Y. 1973); Halderman v. Pennhurst State School and Hospital et al., 451 F. Supp. 233 (U.S.D.C. E.D. Pa. 1978).

While these cases, litigated in the lower Federal court system, may not be binding, the guidance of the cases in terms of the due process rights that should and must be accorded to persons who face institutionalization is extremely pursuasive.

Recent amendments to the Pennsylvania Mental Health and Mental Retardation Act by the Mental Health Procedures Act of July 9, 1976, P.L. 817 (effective September 7, 1976), 50 P.S. §7101 et seq., statutorily reaffirm the policy of this Commonwealth in ensuring due process protection. Section 102, 50 P.S. §7102, outlines this policy:

"It is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill, and it is the purpose of this act to establish procedures whereby this policy can be effected. *Treatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed.* Persons who are mentally retarded, senile, alcoholic, or drug dependent shall receive mental health treatment only if they are also diagnosed as mentally ill, but these conditions of themselves shall not be deemed to constitute mental illness." (Emphasis supplied.)

If "treatment" is required, the type of treatment, the extent of supervision and the appropriateness of

facilities are questions that must be confronted on an individual basis.

It is clear from the facts in the present case that the requested placement of Joseph Schmidt in Western Center is not appropriate to encompass the type of training and supervision he needs that might ultimately enhance his potential and reduce the ultimate necessity for constant supervision.

It is not sufficient to appear before this court and state that no facility exists that can accommodate Joseph Schmidt. The thrust of Joseph's right to due process envelops not only what exists but what can be *developed.* See Goldy v. Beal, supra. In In re: Joyce Z, 123 Pitts.L.J. 181, 184, 4 D. & C. 3d 596 (1978), the Juvenile Court of Allegheny County required the county to search out for a minor in similar circumstances as Joseph options such as foster care, group homes or a combination of programs. It is possible that adequate facilities do not exist. It is possible that adequate facilities and/or placements cannot be developed. For this reason the court in its order mandated a *good faith* effort at finding or developing a program and placement that is responsive to the needs of Joseph Schmidt. It is the opinion of this court that the order entered ensures the right of Joseph Schmidt to due process of law. Merely to commit Joseph to Western Center now and forever, knowing full well that it is not an appropriate accommodation, and not fully to explore the existence or development of a better alternative would be repugnant to the standards ensured and preserved in the right to due process.

Having determined that Joseph has a *right* to placement in a facility other than Western Center, the key issue becomes whether the Commonwealth or the county has the responsibility to locate or

develop this placement. The trial judge placed this burden on the county. The county excepts to that decision claiming that such an order extends beyond the scope of the statute. This court is of the opinion that the order as it exists is proper.

The county first argues that under the statutory delineation of powers as between the State and county, the county is not responsible for finding or developing an appropriate placement for Joseph. The thrust of the argument set out by the county is that Joseph is not in need of *interim* care; thus, the county is not responsible but rather responsibility rests with the Commonwealth. It is this issue upon which the county relies in distinguishing this case from that of Joyce Z, supra. The county has argued that Joyce Z was being placed while awaiting admission to Western Center, whereas Joseph Schmidt has already been admitted. Such an approach is repugnant to the philosophy and intent of the order of the trial court. It is clear that Joseph was placed in Western Center simply because no other facility existed for him. The court was aware that a long term placement at Western Center was not appropriate; thus, the remainder of the order followed.

Joseph Schmidt's case presents an accurate reflection of statutory law that attempts to embody generalized definitions to fit changing circumstances and various situations. The court assumes the argument that Joseph is not in need of interim care as it is defined by statute or regulations. The court questions whether or not such a term is given any definition that has meaning. Section 301(d)(8) of the Mental Health and Mental Retardation Act, supra, 50 P.S. §4301(d)(8), makes the county responsible for "[i]nterim care of mentally retarded

persons who have been removed from their homes and who having been accepted, are awaiting admission to a State operated facility." Regulations issued by the Department of Welfare define an interim care facility as a private residential facility that provides interim care. But what is interim care in any realistic sense? It is possible that Joseph will never progress to the extent that placement in a setting with a 1-14 ratio will be appropriate. If this does not occur, Joseph will not be an interim care patient. He will be in need of long-term, non-institutionalized care for the rest of his life. On the other hand, if Joseph receives an appropriate placement that meets his needs, in a setting that proves successful in accomplishing progressive training and a reduction of dependency on constant supervision, the time might come when a placement at Western Center will in fact be appropriate. Neither the county, the State nor the court has any feasible manner of making such a projection. It is obvious that if Joseph is to be afforded an opportunity to progress he must be placed now in a facility and program that are equipped to address his needs.

The county's argument is deficient for other reasons. While the county amply quoted parts of the statute that delineated the county's responsibility, the county neglected to quote the entire portion of the statute. In fact the statute supplies authority to the county in section 301(e)(3) of the Mental Health and Mental Retardation Act, supra, 50 P.S. §4301(e)(3), which states: "(e) Such local authorities shall also have the power to establish the following additional services or programs for the mentally disabled . . . (3) Any other service or program designed to prevent mental disability or the

necessity of admitting or committing the mentally disabled to a facility." Clearly, this grant of power authorizes the type of facility, service or program that is appropriate for Joseph Schmidt.

The statute in section 201 also grants regulating powers to the Department of Welfare: 50 P.S. §4201(2). Pursuant to the statute and prior to passage of such regulations, the Department of Welfare is obligated to give 30 days' written notice to the county along with an opportunity for a hearing to local authorities, e.g., the county.

In essence the statute grants authority to the State through the Department of Welfare to supervise and coordinate services that are essential. The statute obligates the Department of Welfare to ensure the availability and equitable provision of adequate mental health and mental retardation services for all persons who need them under section 201 of the Mental Health and Mental Retardation Act, supra, 50 P.S. §4201. It was in fulfilling this responsibility that the State intervened in the present case.

In exercising its authority to pass regulations and in an attempt to fulfill its statutory obligation the Department of Welfare promulgated regulations concerning the commitment of retarded persons.

As quoted earlier, the regulation sets standards that must be met prior to commitment. The department also passed the following, Appendix IV, adopted February 10, 1975, which states:

"The County Program is the means by which minimum services as described in the act shall be readily available to promote the social, personal, physical and *economical habilitation or rehabilitation of mentally retarded persons with all respect for the full human, social and legal rights of*

*each person. This means that the health, social, educational, vocational, environmental and legal resources that serve the general population shall be marshalled and coordinated by the County Program to meet the personal developmental goals of mentally retarded persons, in accordance with the principle of normalization.* Normalization means to ensure for every mentally retarded person and his family the right to live a life as close as possible to that which is typical for the general population. The mandated services, the provision of service mechanisms and the fiscal support of the program must all be used to secure for each person and his family, the conditions and circumstances of day to day life that comes as close as possible to representing normal life patterns. In keeping with the principle of normalization, the County is responsible to utilize County Program funds for the mentally retarded to accomplish the following objectives. . . . 4. Shaping and maintaining an environment most productive of basic human personality qualities involving . . . sibling relationships, environmental adaptation, self-awareness and learning maturation and ability. . . . 6. Community development and restructuring to achieve the maximum normalization for the mentally retarded person wherever he is."

Appendix IV further defines the responsibility of the County Administrator as follows:

"The County Administrator shall be responsible for the establishment of an organizational unit consisting of multidisciplinary professional and nonprofessional staff capable to plan, direct and coordinate appropriate services for persons who are mentally retarded and in need of service from the

County Program. This unit shall be called the Base Service Unit and the County Administrator shall have the authority to direct, control and monitor the activities of the Base Service Unit. The Base Service Unit shall be responsible to perform the following functions in such a way as to carry out the objectives of the County Program as stated above. . . . D.3. Develop a practical life-management plan for the individual and his family and provide the necessary counselling and follow along services. E. Maintain a continuing relationship with the mentally retarded person."

The court is of the opinion that such regulations are authorized by the statute and protect and ensure the rights of persons such as Joseph Schmidt.

In 1972, the Department of Public Welfare began community living arrangements that provided 100 percent funding to the county to provide alternatives to institutionalization. The responsibility to ensure the existence of such facilities rests with the county.

The Commonwealth Court in Wayne K., Appeal of Allegheny County Child Welfare Services, 34 Pa. Commonwealth Ct. 10, 382 A. 2d 989, 991 (1978), stated: "The Act puts the responsibility for the placement and care of the mentally disabled upon county organizations. . . ."

In light of the authority contained in the statute and its underlying purpose and interest and the regulations properly promulgated thereunder and the continued funding source for alternative living the court finds that the county has an obligation to locate or develop an arrangement appropriate for Joseph Schmidt and that the decision of the trial judge was not an abuse of discretion. If anything, the trial judge granted latitude and flexibility to the

county in providing for a six month period to fulfill an obligation that the county should have fulfilled before Joseph Schmidt's case ever came to pass. The exceptions will be denied.

## ORDER

And now, February 13, 1979, after argument on the exceptions of the County of Allegheny, Office of Mental Health Retardation, filed to the order of court entered December 12, 1977, in the above case and after consideration of the written and oral arguments of counsel for the County of Allegheny and Commonwealth of Pennsylvania, it is hereby ordered, adjudged and decreed that the exceptions are denied. The County of Allegheny is directed to implement forthwith the order dated December 12, 1977. Any appeal taken herefrom shall not act as a supersedeas.